Case No. <u>CP-22-CR-00003560-2015</u>

---

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT

---

### DAVID LESLIE BARKSDAle

**Petitioner**

### JOSEPH TERRA, SUPERINTENDANT
### SCI PHOENIX CORRECTIONAL INSTITUTION

---

#### PETITION FOR WRIT OF HABEAS CORPUS

---

**DAVID LESLIE BARKSDALE**
Reg. No. MU5159
SCI Phoenix
1200 Mokychic Drive
P.O. BOX 244
Collegeville, PA. 19426
Ph. 610.490.7890

Case No. <u>CP-22-CR-00003560-2015</u>

---

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT

---

### DAVID LESLIE BARKSDAle

**Petitioner**

### JOSEPH TERRA, SUPERINTENDANT
### SCI PHOENIX CORRECTIONAL INSTITUTION

---

### PETITION FOR WRIT OF HABEAS CORPUS

---

**DAVID LESLIE BARKSDALE**
**Reg. No. MU5159**
**SCI Phoenix**
**1200 Mokychic Drive**
**P.O. BOX 244**
**Collegeville, PA. 19426**
**Ph. 610.490.7890**

# IN THE UNITED STATES DISTRICT COURT OF DAUPHIN

## COUNTY PENNSYLVANIA, MIDDLE DISTRICT

David Barksdale,                      )
                                      )
          Petitioner,          )
                                      )
                                      )          Case No. **CP-22-CR-0003560-2015**
                                      )
  v.                                  )
                                      )
                                      )
Jamie Sober, Superintendant,          )
                                      )
          Respondant.          )

## PETITION FOR WRIT OF HABEAS CORPUS

## WITH SUGGESTIONS IN SUPPORT

COMES NOW Petitioner, David Barksdale, and petitions this Court for a writ of habeas corpus vacating his Dauphin County convictions for first degree murder, in accordance with Article 1, 14. of the Pennsylvania Constitution 28 USC 2254 [2254]. In support of petition, David Barksdale states:

### JURISDICTIONAL STATEMENT

1.    David is incarcerated at SCI Phoenix, 1200 Mokychic Drive Collegeville, Pennsylvania 19426. Jamie Sorber is the Superintendant of SCI Phoenix and is the proper named Respondent in this matter.

2.    No petition for writ of habeas corpus has been filed in any other court in connection with this newly presented evidence, the subject of this petition.

3.    David was denied his state and federally protected right to effective assistance of counsel, as garunteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article 1, § Sections 1, 6, 8, 9, 11, 13, and 14 of the Pennsylvania Constitution, in that David's PCRA attorney was ineffective for faling to raise Isaura Simpson-Perez's confession to police in the 1925(b) statement or brief in support, failed to raise a prosecutorial misconduct, abuse of trial court discretion claims, failed to properly preserve a layered ineffectiveness claim of prior PCRA counsels failure to respond to 907 notice of intent to dismiss PCRA. Prior PCRA counsel failed to specify and develope Petitioners PCRA claims raised in Supplemental PCRA, was ineffective for not

1.

pressing the fact that the appellants lawyer on direct appeal was constitutionally ineffective for not claimng that the trrial lawyer was ineffective for failing to call Isaura Simpson-Perez as a defense witness during Barksdale's trial.

## STATEMENT OF THE CASE

**A.    PROCEEDURAL HISTORY**

4.    Approximately nine months after Swann's body was dicovered, Barksdale was arrested and charged. Tracy Mitchell, who has a Schizophrenic mental health history, a police record for drug sales, and prostitution, called police and told them David came home drunk and threaten to kill her and the cat, after Barksdale asked Mithcell to leave because he discovered Mithcell began bringing men into the home one week into renting her a room.

5.    A jury trail was held on December 7-9, 2016, at which time the Commonwelth proceeded on the theory that Barksdale murdered Swann because he was aware that the Agency on Aging was about to begin an investigation into the abuse of his sexual relationship with the victim, as well as possible financial abuse. Barksdale was found guilty of first-degree murder on December 9, 2016, and the trial court sentenced him that same day to a term of life imprisionment. Barksdale's post-sentence motions were denied and he appealed to the Superior court. The Superior cort affirmed Barksdale's judement of sentence on March 6, 2018. Barksdale filed a petition for Allowance of Appeal to the Pennsylvania Supreme Court which was denied on September 14, 2018, causing Barksdale's judgement of sentence to become final on December 13, 2018. Barksdale's lawyers failed to advise him he had 90 days for seeking Writ of Certiorari in the United States Supreme Court.

6.    On December 13, 2018, Barksdale filed a timely PCRA Petition and the PCRA court appointed Barksdale PCRA counsel. Barksdale, through PCRA counsel, filed an amended PCRA Petition on April 2, 2019. The PCRA court filed a 907 Notice of Intent to dismiss PCRA on October 1, 2019. PCRA counsel Micheal Palermo failed to respond within the twenty (20) days given. The PCRA court denied Barksdale's petition on November 27, 2019. On August 4, 2020, a Grazier hearing was held where counsel admitted to abandoning his client for over six (6) months, admitted to irreconcilible difference, and was permitted to withdraw as counsel.

7.    Kristen Weisenberger, Esquire was appointed as counsel. Barksdale filed pro se motions for Grazier hearing held March 3, 2021, and August 8, 2021 where he informed the court counsel undermined claim b in the 1925(b) by failing to incorporate Isaura Simpson-Perez full statement "she and David Barksdale witnessed Peggy Swann fall down the basement stairs *,they realized she was dead,*

and moved her body to the washing machine."

8.    The court refused to acknowlege irreconciliable difference between the defendant and counsel, and Barksdale was forced to either represent himself or remain with counsel. On 9/1/21 Ms. Weisenberger filed an Appellate brief refusing to incorporate Simpson's statement in full to police. On February 7, 2022, the Superior court affirmed the judement of sentence. Barksdale filed pro se Complaint Existing Counsel Abandon Client pursuant to Pa.R.A.P. 121(g) on November 22, 2021, and Petition for Specialized Review to Review counsel's Deficient Stewardship in accordance with Pa.R.A.P. 1925(b) on December 21, 2021, and a Petition for Specialized Review to review Grazier hearing transcript for Abuse of Discretion pursuant to Pa.R.A.P. 1602 on February 1, 2022. All petitions were denied by the Superior court ruling that since counsel filed nine (9) claims in the 1925(b) no abandonment occured, which has no relevance with a request of court to review grazier hearing transcript 3/2/21, and 8/2/21 for the ineffective assistance of counsel not to incorporate Simpson's full statement to police, or an abuse of discretion by the court to ignore irreconciliable difference and appoint new counsel.

9.    On February 24, 2022, counsel filed Petition for Allowance of Appeal in the Supreme court of Pennsylvania, 103 MAL 2022, refusing to incorporate Isuara Simpson-Perez's statement to police "She and David Barksdale witness Peggy Swann fall down the basement stairs, *they realized she was dead*, and moved her body to the washing machine" in the full content of what Isaura confessed to police. Petitioner refiled all previous mention motions in the Supreme court. On June 8, 2022, the Supreme court of Pennsylvania directed the Court of Common Pleas to determine whether  Attorney Wiesenberger Abandon client, or grant relief of Motion for Change of Counsel. The defendants Motion for Change of Counsel was denied July 25, 2022.

10.    The PCRA court failed to properly respond to defendants assertations of PCRA appointed counsel's ineffectiveness in Grazier hearing held 3/2/21, and 8/2/21, and 7/25/22, coupled with the inability of PCRA counsel to meanigfully represent defendant once the allegations had been advanced collectively undermined defendants right to effective assistance of counsel. See *Commonwealth v. Betts*, 240 A.3d 616 (Pa. 2022) Remand **{240 A.3d 615}** for the appointment of new PCRA counsel is the solution to the conundrum posed by the proceedural irregularities in the case. *Accord Kenny; supra* at 1164; *see also, e.g., Commonwealth v. Williams*, 2017 Pa. Super 248, 167 A.3d 1, 6 (Pa. Super 2017) ("[T]he best resolution of this case is to vacate and

remand for [substitute] PCRA appellate counsel to file new amended PCRA petition on Appellants behalf and for further proceedings.") *Commonweatlh v Wills*, 2011 Pa. Super 203, 29 A.3d 393, 400 (remand for appoinment of new PCRA counsel where both the PCRA court and prior PCRA counsel were "responsible" for the effective denial of a PCRA petitioner's right to counsel.) See *Commonwealth v. Albert*, 522 Pa. 331, 561 A.2d 736, 738 (Pa. 1989) (holding that rule-based right to counsel in a PCRA proceeding embodies the "concomitant right to effective assistance of counsel" in the PCRA court.) See also, *Commonwealth v. Albrercht*, 544 Pa. 331, 720 A.2d 693, 699-700 (Pa. 19980 ("appoinment of counsel pursuant to [Pa.R.Crim.P. 904] carries with it 'an enforceable right' to effective post-conviction counsel.) "*Commonwealth v. Shaw*, 2021 Pa. Lexis 1254; Se also, *Commonwealth v. Bradley*, 2021 Pa. lexis 3819 n. EAP 2020

11.    On September 9th, 2022 defendant filed a timely Notice of Appeal in the Superior court, appointed counsel status listed as **NOT** represented. On September 20, 2022, the Supreme Court informed the defendant the Petition for Allowance of Appeal was denied, and the denial order was sent to counsel of record Kristen Weisenberger,Esq. stating only a timely Application for Reconcideration could be filed in this case. On September 22, 2022, Weisenberger filed Notice of withdraw as counsel in the PCRA court, and on September 26th, 2022 the court granted the withdraw <u>without the defendant being present for the hearing</u>. Petitioner filed a pro se Application for Reconcideration with the court.

## B.    STATEMENT OF THE CASE

On or about April 10, 2015, the petitioner was arrested and charge with murder in the First Degree. At trial, petitioner was represented by Mary Klatt, Esq. and Petra Gross, Esq. with the Dauphin County Public Defender Office. On December 5, 2016, the petitioner appeared before the Honorable Deborah E. Curcillo for the purpose of trial by jury. On December 9, 2016, the jury rendered a verdict of guilty, muder in the First Degree and the petitioner was sentenced to life in prison. During trial, Harrisburg City Police Offier Duan Pyles testified that on June 25, 2014, he responded to a call for a strange smell coming from the basement of 107 North 13 Street, the home of Peggy Swann who had been reported missing. [Notes of Testimony from trial (herein referred as N.T.),p. 95-96]. Upon arrival, Office Pyles met with petitioner, and Isaura Simpson-Perez. Upon opening the front door, Officer Pyles testified it was pretty clear that there was something dead inside from the strong nauseating odor he smelled as the door opened. [N.T. 96-97]. Petitioner indicated he thought he saw an ankle towards the back of the house in the basement. Officer Pyles shined his flashlight on the basement floor and observed maggots crawling around on the floor. Towards the back of the basement, Officer Pyles used his baton to move a few of the boards covering the mass, and identified a human being. [N.T. 112]. Officer secured the scene and had everyone wait outside for a supervisor to arrive. During this time Petitioner repeatedly told Officer Pyles that he hoped the body was not Peggy because he loved her, and she was his cougar. [N.T 112-113]

4.

Ms.Bonita Crummel testified she was friends with Peggy Swann, the two would talk often. [N.T. 129]. Ms. Crummel knew the Petitioner through her sister, Michelle Black, and they would get together for drinks on occasions. In June of 2014, Ms. Crummel, her husband, sister, and Petitioner were at "Sweet Man's" house, when petitioner and "Sweet Man" got into a verbal argument. During the argument, Ms. Black called petitioner gay and petitioner responded he is not gay, he has three woman, Phyllis, Peggy, and another young girl. [N.T. 134]. Ms. Crummel returns home and calls Peggy and ask why she is having sexual intercourse with petitioner. Peggy Swann alledgely responds that it is not by choice. [N.T. 138]. Ms. Crummel testified she and Peggy made plans to meet the next day at Alva resturant. Petitioner arrived at Ms. Swan's house, alledgedly took the phone from Ms. Swann, and started harrassing Ms. Crummel. [N.T. 142]. *Petitioner informed the court counsel had phone records providing no calls were made between Swann and Crummel during that time.* [N.T. 1039 L's 2-8].

The next day, June 9, 2014, Ms. Crummel called Area on Aging and reported what Ms. Swann alledgedly had told her regarding sexual intersourse with petitioner. Ms. Crummel then repeatedly called Ms. Swann and Ms. Swann never answered. [N. T. 147]. Around midnight on June 9, 2014 going into June 10, 2014, petitioner alledgedly contacted Ms. Crummel and told her Peggy is missing. Michell e Black testified she met petitioner in 2000.[N.T. 160] Ms Black testified she was on the call between Ms. Crummel and Ms. Swann, and also alledgedly heard Ms. Swann say that she was engaging in sexual intercourse with petitioner against her will, and Ms. Balck and Ms. Crummel told petitioner they were reporting him to Area on Aging. [N.T. 164-166].

Ms Crummel's husband, Maurice Dotson, testified that he and Ms. Crummel went to Peggy's house to look for her when no one was able to reach her by phone. [N.T. 189]. Mr. Dotson knew something was wrong because very blind was down, every door was locked, and Peggy alledgedly never did that. *There is no indication that Dotson was a close friend of Swann's to know how she conducted her house hold interactions.*[N.T. 189]

Ms. Betty Smith, with M&T bank testified that Peggy was a regular customer. [N.T. 217]. Security caneras identified Ms. Swann and petitioner in the lobby of the bank at 12:30:43 hours on June 9, 2014. Ms. Swann exits the bank at 12:37 on June 9, 2014. [N.T. 220].

Detective Andrew Dixon, with the Dauphin County Criminal Investigation Division (herein reffered to as CID) testified that on June 12, 2014, a person from the Aging went to CID and requested an officer conduct a welfare check at 107. North 13th Street, Harrisburg, PA. [N.T. 231-232]. Detective Dixon had a court order for anyone in the residence ot 107 N. 13th Street to allow the detectives inside to do a welfare check. Detective Dixon searched the second floor, where petitioner's bedroom and a pad locked room belonging to roomate Isaura Simpson-Perez was located. Detective Delregno and an Area on Aging employee failed to throughly search

the basement where Swann's body was, which if discovered in a less deterioated state, would have provided a better chance for forensic patholoogist to conduct DNA testing. Dixon testified he had been at the house subsequent times, but he only went inside on June 12, 2014. [N.T. 242]. Detective Dixon noted that on the day he was at the house, the blinds were up. [N.T. 250].

Elena Welsh with Area on Aging testified that they recieved a call that there were concerns that Peggy Swann was alledgedly being sexually abused. [N.T. 254]. The report was recieved June 9, 2014. On June 10, 2014, Ms. Welsh went to check on Ms. Swann, along with a Harrisburg City Police Officer. At this time, Ms. Welash knocked on the door and a roomate Isaura Simpson-Perez answered indicating Ms. Swann was not home, and would not let Ms. Welsh in to check the house. [N.T. 258]. While Ms. Welsh was on the scene, she spoke to petitioner on Isaura's phone. Petitioner indicated he had not seen Ms. Swann, and when Welsh requested to go inside the house he stated, "I don't think it is Isaura's responsibility to deal with people who were gonna be searching the home when she has _Schizophrenic, Bi-polar mental Disorder_, and is on medication. He offered to schedule a time when he could allow them access into the house. [N.T. 259] [N.T. 986 L's 16-18].

Petitioner told Ms. Welsh several places she could try to look for Ms. Swann, including various bars, or calling her granddaughter Uhurina Swann in Pittsburg, Pa. [N.T. 262]. Petitioner told Ms. Welsh that he had known Ms. Swann for several years, and that they did have a sexual relationship during various times. [N.T. 263]. Petitioner said he wasn't refusing to let her inside the house to avoid or that he was affraid of being arrested for a flase claim of sexual harrasment, and that he wouldn't run if he needed to be found by the poilce. [N.T. 256]. Ms Welsh obtained a court order to gain access to the house to check for Swann. Petitioner was told by Ms. Welsh to keep her informed if he had any information, and he called 12-15 times with updates, leaving voice messages on her work phone. [N.T. 269]. Petitioner left voice messages on June 10th, 11th, 13th, 14th, 15th, 16th, 17th, 19th, 29th, and July 2, 2014. Petitioner filed a missing person report for Ms. Swann with the police. [N.T. 317].

Kimberly Long testified that she knew Ms. Swann and Mr. Barksdale because she lived in the neighborhood. [N.T. 329]. Ms. Long testified that petitioner told her he had a consenual sexual relationship with ms. Swann around 2004. [N.T. 334]. Ms. Swann knew Ms. Long for years, and would have told her if any sexual abuse was occuring. Ms. Long last saw Swann on June 7, 2014. [N.T. 339]. Ms. Long testified that after Swann's body was found on June 25, 2014, petitioner told her he "didn't do it." [N.T. 344].

Eugene Moore, another neighbor of Ms. Swann's testified he moved to the area in 2008. [N.T. 351]. On June 25, 2014 Petitioner told Mr. Moore that he thought he had found Ms. Swan's body in the basement. Moore testified, "I think he said...he took a stick and poked something which he thought was her ankle, with a stick...and it came back out with, like, some gooey stuff

on it." [N.T. 356 L's 1-17] The D.A. asked "Did he say anything odd regarding the body?" Moore replies, When he said...he says he think's she was wrapped up in a rug." [N.T. 358 L's 7-9]. "Do you remember what David Barksdale told you about the position of the body?" "Yes, that's what I said. I said before he said it was wrapped up in a blanket, and it was layin, layin flat. That's, that's all I recall. I can't remember what I said exactly that day." [N.T. 360 L's 9-16], which is inconsistent to Officer Pyles findings of a borad covering the body. [N.T. 108], and investigator Karen Lyda's of the Harrisburg Police Department findings that Swann'a body was lying in the basement with a coat overtop of her so that only part of her back was visible. [N.T. 476],

Morre testified he last saw Swann the morning of June 9, 2014. [N.T. 362 L's 11-14]. Mr. Moore aslo told the jury he saw Benjamin Palmer,as well, June 9, 2014, leaving out of the back door of Swann's home which is directly adjacent to the door leading to the basement. Mr. Palermer did not live in the neighborhood.

Me. Phyllis Ann Keeler testified that she had been in a relationship with the petitioner, and they were not dating in June of 2014. [N.T. 367, 369]. Petitioner asked Ms. Keeler if he could stay at her house for the week of June 9, 2014 when Ms. Keeler was on a trip to North Carolina. [N.T. 369]. Mr. Barksale stayed there June 8, 2014 thru June 10, 2014. [N.T. 370]. Ms Keller testified that in the past if Ms. Swann was not home on time petitioner would express concern, but when she went missing on June 9, 2014, she testified, "He did seem concern, I couldn't tell how concered he was," [N.T. 374].

Detective Roxanne Snider testified she was the one who sought the protection order from the court. [N.T. 384]. Appellant called the witness and told her that people had reported to him they saw Swann after she had been reported missing. Appellant also wanted Aging to contact Ms. Swann's grandaughter so she could transfer money from Ms .Swann's account so he could continue to pay the bills, and maintain the house. [N.R. 387].

Marquis Burnette, the appellants cousin, testified he visited appellant on June 24, 2014. [N.T. 394-396]. He went inside, upstairs, and then back out the front door never going towards the basement or the back of the house. [N.T. 397]. As Mr. Burnette was leaving, he started towards the back of the house to the kitchen to get the remainder of his beer, when an odor almost knocks him out completely. [N.T. 400-401]. Mr Burnette admits, "It may have been something in the refrigeratior, but it's only the refrigerator here, and the basement door's here...so I don't know where it was coming from. I just shouted, Yo, what's that smell."

Benjamin Palmer testified the appellant informed him that Ms.Swann had been missing. [N.T. 418]. The District attorney asked Palmer when he might have seen David Barksdale downtown? Mr. Palmer said, "I was going to Howard Street, and I ran into him. [N.T. 418 L's 23-25]. *Howard street does'nt intersect in downtown Harrisburg.* Appellant then alledgedly told

Mr. Palmer that Swann had been found, and that everything was O.K. [N.T. 419 L's 2-3]. After Ms. Swan's body was found, appellant informed Mr. Palmer that the police wanted to speak with him. During Palmers testimony, the Commonwealth asked a question, "Did you see how Isaura and Peggy got along?" [N.T. 423]. Upon defense objection to relevance, the trial court inquired as to whether the Commonwealth was going to call Isaura as a witness, to which the Commonwealth responded, "Yes." [N.T. 423]. The trial court responded, "All right. Lets move forward." [N.T. 423].

Holly martz, with the Dauphin County Tax Claim Bureau testified that on July 1, 2014 appellant appeard upset and was crying because he didn't have the extra $100 dollars to pay on the increase in the tax bill for the residence where Ms. Swann lived. [N.T. 440 L's 2-4] Ms, Martz was trying to calm the appellant and told him, "I realize a lot of people have problems and so forth, and he said, "Well, you didn't find a dead person in your house.' I said, "No, I did not." [N.T. 441 L:'s 2-7]. Ms. Martz  testified that the house was originallly in Ms. Swann's name.[N.T. 444]. Appellant however made various tax payments on the property; December 7, 2009 he paid $100.00;January 19, 2010 he paid $100.00; February 8, 2010 he paid &100.00; March 8, 2010 he paid $100.00; June 7, 2010 he paid $333.83; August 3, 2011 he paid $1,190.97; April 2, 2012 he paid $500 and May 1, 2014 he paid $400.00 [N.T. 447-450].

Investigator Karen Lyda with the Harrisburg Police Department testified there was a strong odor throughout the basement. [N.T. 474]. Ms. Swann's body was lying in the basement with a coat overtop of her so that only part of her back was visible. [N.T. 474]. Investigator Willam Kimmick with the Harrsburg Police Department testified he attended the autopsy of Ms. Swann. [N.T. 519]. At the autopsy Dr. Furey, a forensic entomologist, was present to collect maggots and flies of the corps. [N.T. 520-521]. Dr. Wayne Ross, the forensic pathologist who conducted the autopsy found that Ms. Swann's cheekbone and nose were fractured, and she had fractures to her ribes. [N.T. 590]. The left side of her hyoid bone was broken [N.T. 593]. According to Dr. Ross, the most common cause of a broken hyoid is strangulation. Dr. Ross concluded that the cause of death was tramatice head, neck, and chest injuries, and the manner of death is homicide. [N.T. 595]. Dr. Dennis C. Kirmatt, forensic anthropologist from MercyHurst University, examined Ms. Swann's body. [N.T. 606]. He removed the flesh to observe the bones. Dr. Kirmatt observed 18 fractures on the left side of Ms. Swann's ribs, and 12 fractures on the right side. [N.T. 629]. Dr. Kirmatt concluded that the ribs broke as a result of significant blunt-force trama to the anterior part of the chest and the throrax. [N.T.630]. Ms. Swann's injuries would be consistent with someone kneeling on her chest and strangling her. [N.T. 628-639]. The fact that the rib fractures were not randon and there were not colles fractures, Dr. Kirmattt concluded that the injuries were not consistent with someone falling down the stairs, yet he did not know the content to which the stairs aligned to suport that it was not a fall down the stairs. [N.T. 638 L's 11-19]

Dr. Emmett Furey, an expert witness in entomology testified regarding the maggots found in the basement. A moggot moves through three stages when it reaches third instar (approximately 8 and one half days after death), they go far away from the body to pupate and them mature into adult flies after two weeks. [N.T. 653-654]. Dr. Furey found maggots on the opposite side of the basement from Ms.Swann, but no adult flies. Once the third instar runs from the food source it remains a pupa for apoproximately five days, and then it would turn into an adult fly. [N.T. 657-658]. The unknown is when a fly first finds the body. [N.T. 658].

Uhurina Akili Swann, Ms. Swann's granddaughter, managed Ms. Swann's finaces until Petitioner moved back to Harrisburg. [N.T. 691]. Petitioner called the granddaughter and told her that Swan was missing. Petitioner had no way of knowing, according to the D.A., that $350.00 was missing from Swann's account, but he told Uhurina that the bills needed to be paid. [N.T. 683]. The granddaughter confirmed that $350.00 was drawn from Ms. Swann's bank account on June 9, 2014 and then again after June 9, 2014. Petitioner did not email the granddaughter, as the D.A. claimed, on June 17, 2014, but rather called to tell her there were more bills that needed to be paid. [N.T. 686].

Prior to testifiying, defense objected to Ms. Mitchell being called as a witness pursuant to *Rule 610.* [N.T. 691]. Ms. Mitchell wa' then called to testify regarding her compentency, and the trial court found her competent to testify. [N.T. 692-695]. Ms. Mitchell rented a room from the petitioner. [N.T.699]. One day they alledgedly argued, and Mitchell reported to police that petitioner alledgely came home drunk, and for no reason told Mitchell, *"If you keep fucking with me, you'll be dead just like Peggy."* On the stand, Mitchell told the jury petitioner said, ***"I will kill you like I killed Peggy Swann."*** [N.T. 703].

Ian Munz was incarcerated with the petitioner and Corey Williams. [N.T. 719]. He testified petitioner alledgely told him his girlfriend was in her early 80's and told the jury, "And I guess, like, he was high on crack. I don't...I guess he was smoking crack with her." [N.T. 723 L's 3-6]. Munz testified, "He wanted money, I guess to get more crack, she was not into giving him any money. I think there was a struggle over a purse. [N.T. 724 L's 22-25],the purse upstairs. He pushed her down the stairs, went down the stairs, she was still breathing, he choked her. He ended up, I guess, I thought it was a rug that he rolled her up in, and put her between the dryer and the wall." [N.T. 725 L's 19-25]. On cross examination, Munz is asked, "It was a struggle over a purse, correct?" "I believe so." "I have a red marker, I want you to cirlce in your statement where you told police anything about a purse. [N.T. 751 L's 19-25] Mr. Munz replies "You don't have to, I don't think you're going to find it." "I don't want to, I believe you.[N.T. 752 L's 1-6]

On December 12, 2016, the petitioner filed a Post-Sentence Motion, which was denied on January 18, 2017. On January 26, 2017, the appellant filed a Notice of Appeal with this Superior court. During the appellat procces, appellant was represented by James Karl, Esquire of the

Dauphin County Public Defenders Office. On March 6, 2018, the appellant's conviction was affirmed.

On December 13, 2018, the appellant filed a *pro se* Petition for Post-Conviction Collateral Relief (hereinafter referred to as PCRA). Micheal Palermo, Esquire represented the appellant during the PCRA process. On April 2, 2019, counsel filed a Supplement to the Petitioner's PCRA petition. On October 1, 2019, the trial court issued an Order of Court giving the appellant a 907 Notice of the court's Intent to dismiss his PCRA. Micheal Palermo failed to respond within the twenty (20) days given, and the trial court dismissed the appellants PCRA.

In *Grazier* hearings held August 4, 2020, counsel admitted to abandoning appellant for over six (6) months, Mr. Palermo admitted to irreconciliable difference, and was permitted to withdraw as counsel. On or about December 24, 2019, the appellant filed a *pro se* Notice of Appeal to the s Superior Court. Between December 24, 2019, and todays date the appellant has filed a multitude of *pro se* filings[1] and correspondnace. Kristen Weisenberger, Esquire was apointed counsel. Appellant requested two (2) *Grazier* hearings held on March 2, 2021, and August 2, 2021 where the court refused to recognize irreconciliable difference between counsel and the defendant. Ms. Weisenberger undermined the 1925(b) consise statement, and subsequently thereafter, the appellate brief, and the Allowance of Appeal to the Supreme Court because she refused to incorporate Isaura Simpson-Perez's statement to police "she and David Barksdale witnessed Peggy Swann fall down the basement stairs, ***they realized she was dead***, and moved her body to the washing machine." On July 25, 2022 a third Grazier hearing was held, remanded by the Supreme court order for the Common Pleas court to determine whether Counsel has abandon the client, and appoint new counsel. See ***Commonwealth v. Betts***, 240 A.3d 616 (Pa. Super 2020) (Defendant was entitled to the appointment of substitute Post-Conviction Relief Act (PCRA) counsel to ensure that defendant's interest were adequately represented and his right to counsel fully realized because the failure of  the PCRA court to properly respond to

(See exhibit A1 thru 11)

---

1 January 3, Motion for Change of Appointed Counsel.
2 March 9, 2020 Motion to Disqualify Post-Conviction Proceeding Judge
3 May 1, 2021 Motion to Recuse/Disqualify PCRA Court.

defendant's assertions of PCRA-appointed counsel's ineffectiveness, coupled with the inability of the PCRA counsel to meaningfully represent defendant once the allegations had been advanced, collectively undermined defendant's right to the effective assitance of counsel.)

## GROUNDS FOR RELIEF

## INTRODUCTION

Trial counsel's deficient performance prejudice defendant Barksdale resulting in his conviction for first-degree murder of the victim Pegggy Swann. The case turned upon the jury's credibility determinations and nuanced analysis. Trial counsel's inexplicable failure to discredit and contradict prejudicial prosecutioin evidence, while simultaneously failing to present readily availiabe exculpatory evidence, specifically Isaura Simpson-Perez statement to police, necessary to impeach key prosecution witness, precipitated the jury's factual findings.

All of the police reports amassed in the case suggest that, on 6/14/15, Isaura Simpson-Perez, whom police failed to concider her confession, told them exactly how Swann died.

Stripped to it's essence, the trial pitted Ian Munz and Corey Williams, two inmates who recieved reduced sentence in exchange for their testimony, against Barksdale. Tracy Mitchell, a tenant in Swann's home, who has a mental history of Schizophrenia, police record for drug sales, prostitution, and was released from a mental hospital one day prior to Barksdale's trial, admitted to being on drugs the day of trial, but was admitted to testify against him.

As such, it was incoumbent upon trial counsel to demonstrate the falsity of their testimony in order to prove Barksdale was not involved in the murder. Had trial counsel objected to improper evidence and presented exculpatory and impeachable evidence she had at her disposal, the jury would have been obligated to retiurn a verdict of not guilty.

## GROUND 1: INEFFECTIVE ASSISTANCE OF PCRA COUNSEL

**(i)    PCRA COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE ISAURA SIMPSON-PEREZ'S STATEMENT TO POLICE "SHE AND DAVID BARKSDALE WITNESSED PEGGY SWANN FALL DOWN THE BASEMENT STAIRS, THEY REALIZED SHE WAS DEAD, AND MOVED HER BODY TO THE WASHING MACHINE" IN THE 1925(b) STATMENT OR APPELLATE BRIEF IN SUPPORT.**

In order for an appellant to succeed in a claim of ineffective assistance of counsel, the appellant "must show, by a preponderance of the evidence, ineffective asssitance of counsel which, in the circumstances of the particular case, so undermined the truth-determinaing process that no reliable adjudication of guilt or innocence could have taken place." *See Commonwealth*

11.

*v. Pierce*, 527 A.2d 973 (Pa. 1987); *Strickland v. Washington*, 466 U.S. at 687-88; *See also Commonwealth v Halley*, 870 A.2d 795 (Pa. 2005). Furthermore, [t]he burden is on th appellant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable basis for his or her action or inaction; and (3) but for the errors and ommisions of counsel, there is a reasonble probaility that the outcome of the proceeding would have been different.

Significantly, a petitioner has a rule based right to the appointment of counsel for the first PCRA petition. See Pa.R.Crim.P 904. Pursuant to our procedural rule, not only does a PCRA petitioner have a right to counsel, but he also is entitled to the effective assistance of counsel. See *Commonwealth v. Albert*, 522 Pa. 331, 561 A.2d 736, 738 (Pa. 1989) (holding that rule-based right to counsel in a PCRA proceeding embodies the "concomitant right to effective assitance of counsel" in the PCRA court.) *See also*, *Commonwealth v. Albrecht*, 544 Pa. 331, 720 A.2d 693, 699-700 (Pa. 1998) (appoinment of counsel pursuant to [Pa.R.Crim.P.904] carries with it an 'enfoceable right to effective post-conviction counsel"). *Commonwealth v. Bradley*, 2021 Pa. LEXIS 3819 n. EAP 2020

The sole Constitutional claim here, based on all the various lines of *Constitutional Law § 840.3; Appeal and Error § 1463; Criminal Law § 62; Constitutional Law § 252; Court § 171* is that the petitioner has not been afforded his federally protected right under the Sixth and Fourteenth Amendments of the United States Constitutiona to the effective assistance of counsel, adn is prejudiced by counsel's inaction to effectuated the clients best interest in violation of the *ABA Model Rule 1.3. and Pa.R.Prof.Cond. rule 1.0 - 1.4*

(See exhibit A attahed herein)

The sole constitutional claim here based on all the various line of law and Super presidenc in *Re Winship, Jackson v. Virginia, Murray v. Carrier, Schulp v. Delo, House v. Bell, and Jerry Reeves v. SCI* is whether the District court and the court of appeals would err in not recognizing that the question to be decided in this case is not about the absolute certainty of the petitioner's guilt or innocence, or whether the accused was prejudiced at his trial because the jurors were not aware of the new evidence of Ms. Simpson, but after reviewing *"all"* the evidence concidered together from basic facts to ultimate facts, to weigh the evidence and draw reasonable inferences sufficient to show *"every"* fact with utmost certainty demonstrate that more likely than not no reasonble juror who was aware of *"all"* the evidence would find him guilty beyound a reasonble doubt, or would vote to convict him.

Counsel had no reasonable basis not to include, in connection with defenses that hinge on the credibility of the witness, Isaura Simpson-Perez statement to police of how Swann died in the 1925(b) statement and Applellate brief in support, nor the Allowance of Appeal to the Supreme

Court. The PCRA court refused to acknowledge that counsel's inaction to fully incoporate Simpson's statement to police prejudiced the defendant and appoint new counsel, which left a void in the full magnitude of what the Appellate court would be able to concider. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1122 (Pa. 2008) ([A] developed post-conviction record accompanied by specific factual findings and legal conclusions is an essential tool neccessary to sharpen the issues so that differences at the Apellate level can be mitiated.")

**(ii)    PCRA COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE PROSECUTORIAL MISCONDUCT, ABUSE OF TRIAL COURT DISCRETION CLAIMS, FAILED TO PROPERLY PRESERVE A LAYERED INEFFECTIVENESS CLAIM OF PRIOR PCRA COUNSEL'S FAILURE TO RESPOND TO 907 NOTICE OF INTENT TO DISMISS PCRA. PRIOR PCRA COUNSEL FAILED TO SPECIFY AND DEVELOPE PETITIONER'S PCRA CLAIMS RAISED IN THE SUPPLEMENTAL PCRA, WAS INEFFECTIVE FOR NOT PRESSING THE FACT THAT THE APPELLANT'S LAWYER ON DIRECT APPEAL WAS CONSTITUTIONALLY INEFFECTVIE FOR NOT CLAIMING THAT THE TRIAL LAWYER WAS INEFECTIVE FOR FAIILING TO CALL ISAURA SIMPSON-PEREZ AS A DEFENSE WITNESS DURING BARKSDALE'S TRIAL.**

## GROUND 2: PROSECUTORIAL MISCONDUCT

1.    The prosecutor knowingly perjured himself on two separate occasions, expressd inflamatory remarks, and misrepresented the facts of record when informing the jury that petitioner stated in a voicemail he admits "choking" the victim when, in fact, the only reference made is when he calls to beg police Detective Jason Paul for assistance to tell bonita Crummel to stop going around spreading the word to neighbors that he "choked" this woman. [See exhibits B, B2 attahced hereto.]

In *Mooney v Holohan*, 294 U.S. 103, 115 (1935) (the constitutional requirement of due process is NOT satisfied where a conviction is obtained by the presentation known to the prosecuting authorities to be perjured.) *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), the Supreme court, "The Fourteenth Amendment to the Federal Constitution cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."

The prosecution goes on further to provide additional inflammatory and prejudicial remarks when informing the jury in the closing argument that petitioner admitted to killing the victim. N.T. 1134, L's 19-20, when in fact, that is not what jailhouse informant testified to what petitioner stated, making no admission of killing anyone. [See exhibit C attahced hereto.]; the prosecutor references petitioner stated in verbatim, "they only arrested me because I threaten somebody, and told her I'd kill her like I killed Peggy", which is far from Petitioner's conversation with jailhouse informant Cory Williams. Petitioner was accused of saying, "you'll

be just like her", a threat surely...but no admission, he makes no mention or admission of killing the victim at all. N.T. 803, L's 19-22. [See exhibit C. C1. attached herein]

2.    The Prosecution commited prosecutorial misconduct when he lied and flasely informed the trial court that the Commonwealth would be calling Isaura Simpson-Perez  to testify and be subject to cross examination, [See exhibit D attahced hereto], to ultimately bypass an objection by the defense for hearsay testimony when they were referencing statements made out-of-court by Isaura, N.T.p. 422, L's. 3-13., when the Commonwealth had not planned to call Isaura to testify at all.

The United States Supreme Court has observed that, "even in cases of egregious porsecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case." *Smith v. Phillips*, 455 U.S. 209, 210 (1982) (citing Giglio, 405 U.S.@ 154; *Napue*, 360 U.S. @ 272, in this regard the Court has explained that the effect of a prosecutors's alleged misconduct in the trial [rather than the misconduct itself] constitutes the crutial inquiry for purposes of Due Process. *Giglio v. United States*, 450 U.S. 150 (1972) (prosecution falsely claimed that it did not offer a witness leniency for his testimony); *Miller v. Pate*, 386 U.S. 1 (1967) (prosecution knowlingly presented an expert who falsely identified paint on shorts as blood); *Napue v. Illinois*, 360 U.S. 264 (1959) (prosecution failed to correct witness's false testimony that he had not been offered leniency for his testimony); *Alcorta v. Texas*, 355 U. S. 28 (1957) (prosecution knowingly elicited false testimony from a witness; *Pyler v. Kansas*, 317 U.S. 213 (1942) (prosecution knowingly presented perjured testimony); and *Mooney v. Holohan*, 294 U.S. 103 (1975) (prosecution knwingly presented perjured testimony.)

3.    The prosecution misrepresented the facts of record in these circumstances in front of the jury during closing argument. He took the facts of this case and twisted the words to prejudice the jury. See *Miller v Pate*, supra. Also, in 2017 the Third Circuit held in *Haskell v. Superintendant Green SCI,* 866 F.3d 139 (3rd Cir. 2017), "to establish his claim that witness' false testimony at his trial violated his **Fourteenth** Amendment right to due processs, the habeas petitioner showed that the witness commited perjury, the Commonwealth knew or should have known that the testimony was false, the false testimony was not correct, and there was a reasonble probability that the perjuerd testimony could have affected the judgment of the jury. Given the witness' central role, knowlege of the benifit she recieved in exchange for her testimony posed a reasonable and significant likelihood of affecting the judgement of the jury. This court went further to state. "The standard of review applicable to perjured testimony claims if strict. This is not just these claims involving prosecutorial misconduct, but more importantly because they involve a corruption of the truth-determining function of the trial process. Accordginly, in order to establish his claim, a petitioner must show that: [1] the witness commited perjury; [2] the Commonwealth knew or should have known that the testimony was

14.

false;[3] the false testimony was not correct; and [4] there is a reasonable likelihood that the perjured testimony could have affected the judgement of the jury" The Prosecutor knowingly misrepresented the facts of record when informing the jury Ian Munz said the petitioner said to him that he hid the victim's body between the wall and the washing machine. "Thats exactly where the body was found." N.T.p. 1142, L's 20-22. But the autopsy report tells exactly where Officer Pyles found the body in the North East corner of the residence, not between the wall and the washing machine. [Seee exhibit E. E1. attached herein.]

The Court in, Office of Disc. Counsel v. Tumini, observed that, "False swearing in a judicial proceeding is certainly an egregious species of dishonesty, and is surely also patently prejudicial to the administration of justice." Moreover, a lawyer shall not engage in illegal conduct involving moral turpitude, conduct involving dishonesty, fraud, deciet, or **misrepresentation**, conduct that is prejudicial to the administration of justice, or any other conduct that adversely reflects on his fitness to practice law. **Pa.R.D.E. 1-102 (A)(3), (4), (5), and (6).**

This misconduct of behalf of the prosecution rendered petitioners' trial fundamentally unfair and violated his constitutional rights so that no reliable adjudication of guilt or innocence could have taken place, and had it not been for this improper false misrepresentation of the facts the outcome of the procedings would have been different. In ***Commonwealth v. Correa***, 664 A.2d 607 (Pa. Super. 1995), the court reversed the order denying defendant a new trial and remanded because defendant's claim of prosecutorial misconduct and ineffective assistance of counsel (as in petitioner's case) were established by evidence of record. The court held, "because the prosecutor's improper remarks as well as counsel's failure to object deprived defendant of a fair and impartial trial, and undermined the reliability of the truth-determining process, a new trial was warrented." Like Petitioners' case in point, this court found the the prosecutor's conduct in making reference to an unrealted infamous crime, his negative characterization as to the credibility of the defendent and his witnesses, and **his misreprentation of the facts of record** constituted prosecutorial misconduct which deprived defendent of a fair and impartial trial.

The petitioner has been prejudiced as his jury deliberated on the false misrepresentation of the facts they recieved from the prosecution during his closing arguments. The jury as finder of fact, was given false statements in which to base its decision when petitioner's life hung in the balance. By misrepresenting the facts, the prosecution has violated the **ABA Standards § 5.8**, which provides: "Argument to the jury: (A) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor to intentionally mistake evidence or mislead the jury as to inferences it may draw; (B) It is unprofessional conduct for the prosecutor to express his personal opinon as the the truth or falsity of any testimony of evidence or guilt of the defendant; (C) The prosecutor shall not use arguments

calculated to inflame the jury; and (D) The prosecutor should refrain from arguement which would deprive the jury from it's duty to decide the case on the evidence, by injecting issues broader that the guilt or innocence of the accused under the controlling law by making predictions of the consequences of the jury's verdit.

Additionally, your petitioner was denied his constitutional right when the pollice ultilized "corrupt police tactics" to secure a wrongful conviction of your pretitioner. Detectvie Jason Paul was corrupt and neglectful in his duties when he instructs Isaura Simpson-Perez to say "Just tell us David did it" during her statement to police, leading this witness in providing more false statements to investigators. This detective never investigated any alternative theory, even though this potential suspect, who has a long history of mental health issues, said she was sorry for this, wanted forgiveness, and informed the police that the victim did not suffer, stated she wanted to speak with the victims granddaughter to tell her what happen, and wrote an apology "confession" letter to the granddaughter in the presense of investigators.

Ben Palmer, a 'person of interest', and was the last person sighted exiting the rear door of the victims residence the same day the victim goes missing, was a suspect who has a long history of assaulting and robbing women, and has a strong propensity for violence.[6] Suspect has significant mental health history, admitted to retrieving money from the victim, and found with victims phone number and lead dectectives phone number in his possession when he is taken into custody by police for unrelated robbery offenses. He then continued to lie on the stand under oath when confronted with having victims number in his possession when he's arrested despite officers report and property reciept. N.T. p. 433, L's 23-25, N.T. p. 343, L,s 1-6 He further lied on the stand when he tesified no body answered the door of the victim's residence on 6/9/14, yet Commonwealth's witnes Eugen Moore, witnessed this individual exiting the rear of the victim's residence with his bike on 6/9/14. Rather than investigate, the prosecution and investigator abandon any possible alternative theory, and depended on testimony from two possible suspects and two jailhouse informants to secure a conviction of petitioner.

Finally, police investigators and forensics failed to preserve exculpatory evidence the "tan plaid jacket" covering the victim, the "tank top" tucked under the victim, nor the "paneling" covering the victims body. Prosecutions witness testified these article of evidence were seized and secured with the victim's body and put into evidence on June 26, 2014, yet the public defenders office investigator recovered and photographed these items still remaining at the scene of the crime on September 7, 2015, and again on November 28, 2015. N.T. p. 952-956.

---

[6] In order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determanitie of his guilt of innocence. *Com. v. Johnson*, 727 a.2d 1087, 1094 (Pa. 1999); *Com. v. Hoover*, 107 a.3d 723 (2017)

The key items of evidence were left abandoned and untested although these key items could, or rather would have been the last things the true perpetrator and victim would have come into contact with when the killing occured. There was an over all brekdown in the investigation and mandates relief for such blatant disregard to the **Pa.R.Evid.** and how this wrongful conviction was secured.

Additionally, the prosecutor in this case ignored the crutial exculpatory evidence of Isaura Simpson-Perez who told police, "She and David Barksdale witness Peggy Swann fall down the basement stairs, *they realized she was dead*, and moved her body to the washing machine."

On 12/23/20, petitioner sent District attorney Ryan Lysaght correspondance regarding ABA Model rule of Profesional Conduct Rule 3.8- "Special responsibilities of a prosecutor which defines ethical duties as (iii) - When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutiors jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction.

(See exhibit F attached herein)

In Grazier hearing held 8/2/21, petitioner reminded the prosecutor of his duty to uphold the ABA Model Rule 3.8 (N.T. p. 14 L's 22-25) (N.T. p. 15 L's 1-5). The prosecutor acknowleges his obligation to the rule but states; "*We dont file new evidence when a case is on appeal.*" (N.T. p. 18 L's 4-5)

(See exhibit G attached herein)

The sole constitutional claim here based on all the various lines of law and super presidence in *Re Winship*, 397 U.S. 358 (1970); *Jackson v. Virginia*, 443 U.S. 307 (1979); *Murray v. Carrier*, 477 U.S. 478 (1986); *Schulp v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006); see also *Jerry Reeves v. Fayette* SCI, 897 F.3d 154 (2018) is whether the District Court and the court of Appeals would error in not recognizing that the question to be decided in this case is not about the absolute certainty of Petitioner's guit or innocence, or whether the accused was prejudiced at his trial because the jurors were not aware of the new evidence, but whether after reviewing "ALL" the evidence together from basic facts to ultimate facts, to weigh the evidence and draw reasonable inferences sufficient to show "EVERY" fact with upmost certainty, demonstrate that more likely than not no reasonable juror who was aware of "ALL" the evidence would find hin guilty beyond a reasonable doubt, or would vote to convict him.

Petitioner's constitutional rights were violated by the misconduct of the prosecution rendering petitioner's trial fundamentally unfair and prejudiced petitioner causing a 'grave miscarraige of justice' as this conviction resulted in the wrongful conviction of an innocent man.

17.

## GROUND 3: ABUSE OF TRIAL COURT DISCRETION

1.    The trial court erred and abused it's discretion when allowing heresay testimony prejudicial to petitioner to come in from multiple witnesses. On two separate occasions, the trial court permitted hearsay from Michelle Black and Bonita Crummel where they both testified that the victim disclosed in a phone call prior to her death that her and petitioner's sexual relationship was not consentual, and that she informed them she would be willing to cooperate in any report of abuse. The declarant is the decedent and there is no possibility for the defense to cross-examine said witness about these allegations. The court held in *Commonwealth v. Lippert*, 311 A.2d 586 (1973) (where husband was charged with murdering his wife, testimony regarding declarations of the wife, as to past abuse by husband, MUST be excluded as hearsay). In *Unites States v. Brown*, the court similarly held, ("To allow hearsay statements which relate to past events on memory or belief under the state of mind exception would, in effect, swallow the hearsay rule.) *id*. @ 160 U.S.App. D.C. 190, 490 F.2d 758, 755 (1973)

Furthermore, the prosecution brought in statements that the declarant, Isaura Simpson-Perez, made and when asked by the trial judge if this witness would be testifying the prosecution informed the court they would, in fact, be calling her to testify. N.T. p. 422, L's 3-13. The court in *Commwealth v. Romero*, 722 A.2d 1014, 1017-1018 (Pa. 1999) (witness was not availiable for cross-examination when witness refused to answer questions about prior statements.) Said statemenst from or concerning Isaura Simpson-Perez, constituted hearsay, and should have been objected to by counsel, and stricken from the record by the trial court.

2.    The trial court abused it's discretion and committed reversible error when refusing petitioner the opportunity to speak in violation of the Constitution of Pennsylvania **Article, I §, 9** (N.T. p. 1071) and for refusing to permit petitioner the opportunity to move for Change of Counsel. (N.T. p. 928-942). Petitioner attemps to explain the issues of conflict, but was denied effective assistance of counsel. Petitioner was aware that he may reject appointed counsel for good cause shown.

(See exhibit H attached herein)

In *Commonwealth v. Tyler*, 360 A.2d 617 (1976), the Pennsylvania Supreme court held, "Where prior to trial the defendent announced dissatisfaction wtih court appointed counsel because of irreconcilible difference, as to the manner in which the trial should be conducted, and there was no evidence that his request for appointment of new counsel was an abuse of discretion, entitiled him to new trial counsel." In this petitioners case, he adamantly attempted to inform the trial court of his problems with counsel to no avail. N.T. 928-942. Clearly, there was a serious conflict with  petitioner and trial counsel which was evidenced by the conciderable amount of correspondance petitioner sent to the Clerk of Court regarding these attorneys to develope a record of these irreconciliable differences. *(See criminal docket from 2015 thru 2016)*.

18.

3.    The trial court erred when failing to award petitioner a New Trial or ORDER an Arrest of Judgment due to this verdict being so contrary to the evidence presented as to shock ones conscience, sense of justice.

As asserted and outlined supra, **Ground #1,** herein, the evidence or the lack thereof, was significantly insufficient to sustain a conviction for First Degree Murder. In *Commonwealth v. Chamberland*, 30 A.3d 381 (2011), the court explained, "A trial court should award a new trial on this ground only when the verdict is so contrary to the evidence as to shock ones sense of justice."

4.    The trail court erred and abused its discretion when downplaying the mental incapacity of Commonwealth's witness, Tracy Mitchell, when advised and knowledgeable that she, in fact, was not competent to testify. N.T. p. 690.This witness had previous mental heatlh issues and diagnosis' and court staff advised the trial court of her competency, but the trail court allowed the testimony of this witness. In *Commonealth v. Williams*, 141 A.3d 440 (2016), the court held, "The trial courts inappropiate and substantial downplaying of a material impeachment concern in relation to such testimony seems to be an error of an essential structural magnitude, impairing the integrity of the verdict."Similarly, in petitioner's case the wtiness's mental capacity or compentency was at issue, and this court should have refrained from permitting said tesimony as the credibility of this witness was completely unreliable.

5.    The trial court erred when failing to instruct the jury on corrupt/polluted source charge of cautionary instruction, as well as, inconsistent statement instruction when providing the jury with the law in which to base it's reasoning and fact finding. The Commonwealth had multiple witness who had pending charges in the office in which he was testifying for, and two jailhouse informant's testimonies where they were both being offered something in exchange for their testimony, and had a lot to gain by fabricating statements. "This cousel argued that D.M. was not telling the truth, that his testimony was from a corrupt polluted source, and that it should be recieved with great caution because D.M had an interst in the outcome of this case." *Commonwealth v. Hoover*, 107 A.3d 723 (2017). Also in *Walker v. Jones*, 2017 U.S.Dist. LEXIS 40725 (2017) the court stated, "specifically, the jury should have been instructed that prior inconsistent statements were to be used for impeachment/credibility purposes only not to prove that one statement is a lie and the other is the truth, and definately NOT be used as substantive evidence of guilt." This petitioner was denied his right to a fair trial, and should be entitled to immediate relief.

6.    The trial court committed reversible error when failing to allow the admittance of an apology "confession" letter from potential suspect, Isaura Simpson-Perez, to come in as evidence for the jury to consider so that this witness and her statements would be subject to cross-examination regarding this apology "confession" letter and countless inconsistent statements,

which in essense would have potentially exonerated petitioner.

(See exhibit I attched herein)

7.    The trial court erred when failing to instruct the jury on various lesser degrees of homicide and the law in relation to each relating to Criminal Homicide and its counter parts, for the jury to concider during its deliberations.

8.    The trial court committed reversible error and abused its discretion when allowing the prosecutor's inflammatory, impermissible, prejudicial and perjured misrepresentatoin of the facts of this case in closing arguement to go unchecked or stricken from the record, disregarding their prejudicial effect it would have on petitioner, and the bias it would create.

The courts have held that,"A prosecutor is permitted to vigorously argue his case so long as his comments are supported by evidence, and contain inferences which are reasonably derived from that evidence." *Commonwealth v. LaCava*, 666 A.2d 221 (1995) In petitioner's case, the facts of the evidence were not supported by the record which results in reversible error on behalf ot the Commonwealth. In *Commonwealth v. Tedford*, 960 A.2d 1, 32 (Pa. 2008) (Reversible error arises from a prosecutors comments, "only where the unaviodable effects is to prejudice juror(s) forming a fixed bias and hostility towards the defendant, such that they could not weigh the evidence objectively, and render a fair verdict.)

9.    The trial court erred and abused its discretion when failing to declare a mistrial[2] on the account ofprosecution's inflamatory, inpermissable, prejudicial misrepresentation of the facts of this case to the jury during closing arguments and allwing the prosecution to sway the jury by way of false misrepresentation of the statements and facts of record.

Therefore, your petitioner has raised material issues with arguable merit that entitle him to relief. Clearly, from all the salient facts of record that a material factual controversy exists requiring a hearing to be conducted. These error(s) prejudiced petitioner by denying him a fair trial, and had it not been for the blatant disregard for petitioner's constitutional rights the outcome of these results would have been different. Your petitioner, in the interst of justice, should be entiled to a new trial for all the grounds and subsequent claims otulined and asserted herein.

---

2."Prosecutorial misconduct is grounds for mistrial where: [1] the prosecutor's remarks are in fact improper; [2] the remarks prejudcially affect the defendant's substatial right so as to deprive the defendant a fair trial." U.S. v. O'Dell, 204 F.3d 829, 834 ( Cir. 2000)

10.    The Trial court erred and abused its discretion in Grazier hearings held on 3/2/21, and 8/2/21 wherein petitioner raised violations to Pa.R.Prof.Cond. Rule 1.0 thru 4.0 by court appointed counsel for failing to include Isaura Simpson-Perez's statement to police "She and David Barksdale witnessed Peggy Swann fall down the basement stairs, ***they realized she was dead***, and moved her body to the washing machine" in 1925(b) statement which undermined the claim (b).The PCRA court refused to acknowledge irreconcilible difference between court appointed counsel and the defendant, thus petitioner was forced to choose between self representation or remain with counsel.

The defendant may reject court appointed counsel and petition for a change of counsel only upon showing of good cause. Irreconcilible differences or complete breakdown in communication between the attorney and client which could result in inadequete representation of the defendant would be sufficient to establish good cause for change of appointed counsel. ***Commonweath v. Tyler***, 468 Pa. 193, 360 A.2d 617 (1976); ***Commonwealth v. Ingram***, 404 Pa. Super. 560, 591 A.2d 734 (1991)

11.    The ABA Model Rule of Professsional Conduct Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promtiness in representing a client." The preamble of the model rule states that "[as] advocate, a lawyer zealously asserts the clients position under the rules of the adversary system." Counsel's ineffective actions in deriliction of her duty resulted in her refusing to raise Ms. Simpson's statement to police in the Appellate brief, nor the Allowance of Appeal to the Supreme court.

In ***Commonwealth v. Lee***, No. 297 EDA 2020, Cr-6869-2016 the court held; "As this is appellant's first PCRA petition, he enjoys a well-recognized righ to legal representation during this initial collateral review of his judgement of sentence. ***See Commonweatlh v. Albert***, 561 A.2d 736, 738 (Pa. 1989) ("[I]n this Commonweatlh one who is indegent is entilted to the appoinment of counsel to assist with an initial collateral attack after judgement of sentence.") In this context, "the right to counsel conferred on initial PCRA review means 'an enforceable right' of the effective assistance of counsel. ***See Commonweatlh v. Holmes***, 79 a.3d 562 (Pa 2013) (qouting ***Commonwealth v. Albert***, 720 A.2d, 699-700 (Pa. 1998) ***See also, Commonweatlh v. Kenny***, 732 A.2d 1161, 1164 (Pa. 1999); ***See also Commonwealth v. Cox***, 204 A.3d 371, 390 (Pa. 2019) (affirming ***Kenny*** for the proposition that "remand for appointment of counsel is appropiate remedy when the right to appointment [of] counsel has been effectively denied.")

12.    Counsel is given opportunity, by the court, to address issues not filed in the 1925(b) and to explain why they have no merit, but admitts to the irreconcilible difference. *See Grazier hearing 3/2/21*

**Attorney Weisenberger:** "I dont think we have a relationship that will advance his issues and allow me to maintain my eithical obligations to the court. The issues that he wanted to address

in his 1925(b) are without merit, and I--I don't know what else I can do for him. N.T.p. 14 L's 5-11 "I don't know what more I can do to try and foster a relationship, I think we're kind of at a standstill. N.T.p. 14 L's 16-20

**The Court:** "I don't believe he has shown irreconciliable differences." N.T.p. 15 L's 1-6

Based on all the various lines of law and super presidence in *Re Winship, Jackson v. Virginia, Murray v. Carrier, Schulp-Delo, House v. Bell, Jerry Reeves v. SCI Fayette* is whether the District court and the Court of Appeals would error in not recognizing that the question to be decided in this case is not about the absolute certainty of the petitioners guilt or innocence, or whether the accused was prejudiced at his trial because the jurors were not aware of *all* the new evidence, but whether, after reviewing all the evidence considered together from basic facts to ultimate facts, to weigh the evidence and draw reasonable inferences sufficient to show *every* fact with utmost certainty, demonstrate that more likely than not, no reasonable juror who was aware of *all* the evidence would find him guilty beyond a reasonable doubt, or would vote to convict him.

Additionally, Common Pleas Judge Deborah E. Curcillo, and Assistant District Attorney Ryan H. Lysaght *"are establishing a pattern"* of violation of defendants due process rights. In 2020, the same case matter resulted in the Superior Court remanding with instructions due to the violation of Tasia Betts right to effective assistance of counsel. *See Commonwealth v. Betts*, 240 A.3d 616; (Pa. Super 2020) (Defendant was entitled to the appointment of substitue Post-Conviction Relief Act counsel to ensure that defendants interest were adequately represented and his right to counsel fully recognized because the failure of the PCRA court to properly respond to defendants assertions of PCRA-appointed counsel's ineffectiveness, coupled with the inability of PCRA counsel to meaningfully represent defendant once the allegations had been advanced, collectively undermined defendants right to the effective assistance of counsel. 13. Remand **{240 A.3d 625}** for appointment of new PCRA counsel is the solution to the conundrum posed by the proceedural irregularities in the case. 14 *Accord Kenny, supra* at 1164; *see also, e.g., Commonwealth v. Williams,* 2017 Pa.Super 248, 167 A.3d 1, 6 (Pa. Super 2017) ("[T]he best resolution of this case is to vacate and remand for [substitute]PCRA appellate counsel to file new amended PCRA petition on Appellants behalf and for further proceedings.") *Commonwealth v. Willis,* 2011 Pa. Super 203, 29 A.3d 393, 400 (Pa. Super 2011) (remand for appointment of new PCRA counsel where both the PCRA court and prior PCRA counsel were "responsible" for the effective denial of a PCRA petitioner's right to counsel.)

Counsel had no reasonable basis for their inaction which prejudice the petitioner because absent Isaura Simpson-Perez's full statement to police, there was no way other than thru atorney of record to present a complete defense. Petitioner has been denied due process rights to present his claims to the Superior court, or in the Allowance of Appeal to the Supreme court which could have resulted in being granted an evidentiary hearing, fair dispositon of the case, or possible exhonoration.

(C)     Failed to properly preserve a layered ineffectvieness claim of prior PCRA counsel's failure to respeond to 907 Notice of Intent to dismiss PCRA, and his failure to specify and develope claims raised in the Supplemental PCRA.

1.     On October 1, 2019, the Honorable Judge Deborah E. Curcillo issued the trial court Memorandum Opinion, and 907 Notice of Intent to Dismiss PCRA within twenty (20) days of the notice. Counsel Micheal Palermo,Esq. sent petitioner correspondance that either he could file for a hearing, or allow the PCRA to be dismissed and seek relief in the Superior court. On October 9, 2021 petitioner sent counsel a letter requesting he file for a hearing, counsel failed to repseond. From 10/9/21 to 11/22/19 petitioner tried to communicate with counsel by sending eleven (11) letters challenging the merit of the issues. Counsel neglected to answer his client, and failed to respond to the 907 notice. On November 27, 2019, the court issued Final Dismissal Order of PCRA.

                              (See exhibit J attached herein)

        PCRA counsel Kristen Weisenberger, Esq. was ineffective for not raising a layered ineffectiveness claim. Prior PCRA counsel Micheal Palermo, Esq. was ineffective because after the prosecution rendered it's Opinion in Opposition claiming counsel was ineffective for not specifying and developing petitoners supplemented claims, Palermo failed to file leave to reply to the prosecution. Palermo failed to respond to the courts neglect in not giving a reason within the 907 for it's intent to dismiss the PCRA, Palermo neglected to answer within twenty (20) days once the court issued the ruling. There was no reasonable basis for counsel's derelict representation for not responding to the 907 Notice of intent to dismiss PCRA, specifically, since counsel sent petitioner letter asking if he desired to file motion for a hearing, or allow the case to go before the Superior court. Defendant was prejudice by not being given the opportunity to challenge the claims, or recieve a possible evdentiary hearing or new trial.

        Counsel Palermo, Esq. was ineffective for not raising a layered claim of ineffective assistance of Direct Appeal lawyer James Karl, Esq. being ineffective for not rasing trial counsel Mary Klatt, Esq. and Petra Gross, Esq. refusal to put Isara Simson-Perez on the stand for the defense. In his appellate brief, counsel Karl mentioned Simpson being a resident in Swann's home, but fails to mention any of Simpson's inconsistant statements, or admitting to police "She and David Barksdale witnessed Peggy Swann fall down the basement stairs, *they realized she was dead*, and moved her body to the washing machine." Counsel also negelcted to incorporate Simpsons confession letter to police in his brief, and was ineffective for not raising the fact that trial lawyers refuse to interview Simpson prior to trial. Clearly, a defendant has a Constitutional

23.

right under the Sixth and Fourteenth Amendments to the United States Constitution to present a complete defense. See *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Crane v. Kentucky*, 476 U.S. 683 (1986); *Chambers v. Mississipi*, 410 U.S. 284 91973) There was no reasonable basis for counsel's derilict representation in violaton of **ABA Model Rules of Pofessional Conduct Rule 1.3** which provides that "[a] lawyer shall act with reasonable diligence and promtiness in representing a client." The preamble of the Model Rules states that "[as] advocate, a lawyer zealously asserts the clients position under the rules of the adversary system."

Counsel Weisenberger failed to preserve a layered claim of ineffective assistance of prior counsel Micheal Palermo's failure to include Certificate of Witness in his Suplemental PCRA Petition. Nor did counsel challenge the denial of claim "S" in the Trial Court Memorandum Opinion stating that; "Niether PCRA counsel nor Petitioner provided the name of **ANY** witness that would have been ready and willing to testify. Seeing that Petitioner failed to prove that a witness even existed, we cannot hold that trial counsel was ineffective for failing to call witnessess that did not exist.

(See exhibit K 1 thru 4 atttached herein)

## Pa.C.S.A. § 9545(d)(i)(ii) - Evidentiary hearing.

**(i)**     Where a petitioner request an evidentiary hearing, the petition shall include a certificate signed by each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any documents material to that witness's testimony.

**(ii)**     If a petitioner is inable to obtain the signature of a witness under subparagraph (i), the petitioner shall include a certification, signed by the petitioner or counsel, stating the witness's, name, address, date of birth and substance of testimony. In lieu of including the witness's name and address in the certification under this subparagraph, counsel may provide the witness's name and address directly to the Commonwealth. The certification under this subparagraph shall include any documents material to the witness's testimony and specify the basis of the petitioners information regarding the witness and the petitioner's efforts to obtain the wtiness's signature. Nothing in this subparagraph shall be construed to contravene any applicable atttorney-client privilege between the petitioner and postconviction counsel.

Counsel's derelict representation was in violation of **Pa.R.Prof.Cond. Rule 13. [1]** A lawyer shall pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and take what ever lawful and ethical measures as required to vindicate a client's cause of endevour. Defendant was prejudice by PCRA counsel's inaction to properly challenge the claims on review by the Superior court, prejudiced by his trial counsel's failure to call Isaura Simpson-perez for the jury to deliberate her tesimony of factual exculpatory evidence in the case which could have potentially exhonorated the Petitioner.

24.

## GROUND 4: PETITIONER WAS DENIED HIS STATE AND FEDERALLY-PROTECTED RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT PRE-TRIAL, SENTENCING, POST-SENTENCING, DIRECT APPEAL, AND PRCA PROCEEDINGS WHERE ALL PREVIOUS COUNSEL UNDERMINED THE ENTIRE TRUTH DETERMINING PROCESS SO THAT NO RELIABLE ADJUDICATION OF GUILT OR INNOCENCE COULD HAVE TAKEN PLACE.

Petitioner had a state and federally-protected right to the effective assistance of counsel at pre-trial, trial, sentencing, post-sentence, and direct appeal proceedings where an unconstitutional breakdown occurred which rendered your petitioner's pre-trial, trial, sentencing, post-sentence, and direct appeal proceedings fundamentally unfair in violation of petitioner's Due Process, and Equal Protection rights governed and secured by the **FIRST, FOURTH, FIFTH, SIXTH,** and **FOURTEENTH** Amendments to the United States Constitution and **Article I, §§1, 6, 8, 9, 11, 13** and **14** of the Pennsylvania Constitution.

Petitioner asserts that the following instances of ineffective assistance of all previous counsel's performance did so undermine the truth determining process that no reliable adjudication of guilt or innocence could have taken place and had it not been for the ill-advice and representation of all previous counsel the outcome of these proceedings would have been different. Petitioner has been prejudiced by the massive amount of ineffective assistance of all previous counsel and deprived petitioner of a fair trial and due process resulting in a grave miscarriage of justice as the conviction of Criminal Homicide of the First Degree resulted in the wrongful conviction of an actually and factually innocent petitioner, and in the circumstances of petitioner's particular case did so undermine the truth determining process that no reliable adjudication of guilt or innocence could have taken place by way of:

1.      All previous counsel rendered "global" ineffective assistance of counsel and their failings, both individually and collectively, prejudiced petitioner warranting a New Trial for the cumulative effect of all of the following error(s) and/or omission(s). The cumulative effect of these errors deprived petitioner of effective assistance of all previous counsel and caused him prejudice. Tayor v. Kentucky, 436 U.S. 478, 788 (1978) (cumulative prejudice undermined fairness of trial requiring relief).

The Court's held in United States ex rel. Sullivan v. Culyer, 631 F.2d 14, 17 (3rd Cir. 1980) ("The cumulative effect of the alleged error may violate Due Process requiring grant of the writ, where any one alleged error considered alone may be deemed harmless."); Berryman v. Morton, 100 F.3d 1089 (3rd Cir. 1996) (granting relief by considering the cumulative effect of several errors by counsel); and, Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009) (where multiple instances of deficient performance are found, the assessment of prejudice may be premised upon cumulation).

In petitioner's case there are multiple instances following of the ineffective assistance of all previous counsel which rendered your petitioner's trial fundamentally unfair for the cumulation of **many** errors. "Yet when the failure of individual claims is based upon lack of prejudice, the cumulative prejudice arising from those individual claims may properly be

considered." Commonwealth v. Simpson, 112 A.3d 1194, 1205-1206 (Pa.2015). Clearly, your petitioner is entitled to relief for the mass amount of layered ineffective assistance of counsel.

2.    All previous counsel were clearly ineffective for failing to request the mental health records of Commonwealth's witness, Tracy Mitchell, as her competency was at issue and would have gone directly to her credibility.

3.    All previous counsel were ineffective for failing to move to impeach Commonwealth's witness' credibility regarding matters in which they testified. During petitioner's trial there was testimony and statements presented by countless witnesses whose testimony and/or statements were inconsistent, contradicting or flat out perjured remarks.
The Court held in Walker v. Jones, 2017 U.S. Dist. LEXIS 40725 (2017), "Specifically, the jury should have been instructed that prior inconsistent statements were to be used for impeachment/credibility purposes only, not to prove that one statement is a lie and the other is the truth and definitely NOT be used as substantive evidence of guilt." Use of prior inconsistent statements or substantive evidence was reversible error, because statements were not either given under oath at a formal legal proceeding [hearing] reduced to a written, signed and adopted by the declarant or recorded verbatim." Commonwealth v. Lively, 610 A.2d 7 (1992).
Clearly, petitioner's previous counsel rendered ineffective assistance of counsel warranting petitioner to immediate relief under the PCRA.

4.    Trial counsel were clearly ineffective for failing to object to Commonwealth's prejudicial misrepresentation of facts in his remarks to jury in closing arguments. Counsel had a duty to protect petitioner's interest and trial counsel left this misrepresentation of facts go unobjected causing petitioner prejudice as the jury received a bias presentation of the evidence in this case.
In Commonwealth v. Dennis, 715 A.2d 404, 419 (Pa.1998) the Court stated, "Accordingly, we stressed that prosecutorial misconduct in argument is a matter of special concern because of the possibility that the jury will give special weight to prosecutor's comments, arguments..." Counsel is to provide assistance where the petitioner was confronted with this prosecutor's improper advocacy and trial counsel made no objection to this misrepresentation of the facts. In U.S. v. Cronic, 466 U.S. 648 91984), the **Sixth** Amendment requires not merely the provision of counsel to the accused in a criminal prosecution, but assistance which is to be for his defense, and thus, the core purpose of the counsel guarantee is to assure assistance at trial when the accused is confronted with both the intricacies of law and the advocacy of the prosecutor, if no actual assistance of the accused's defense is provided then the constitutional guarantee has been violated. See also, Commonwealth v. LaCava, 666 A.2d 221 (1995) (failure of counsel to raise issue of prosecutorial misconduct arising from improper and prejudicial statements constitutes ineffective assistance of counsel).
Clearly, petitioner's trial counsel's deficient performance deprived petitioner of a fair trial and undermined the confidence in these proceedings and therefore petitioner is entitled to relief.

5.    Trial counsel rendered ineffective assistance of counsel for failing to move for a mistrial for the inflammatory, and prejudicial misrepresentation of the facts in the prosecutor's remarks to the jury during closing arguments. Failure of trial counsel to move for a mistrial for these remarks would have had no rational, strategic or tactical value to petitioner's defense.

The Courts have held that, failure of defense counsel to object, or to request an instruction, or motion for a mistrial, constitutes ineffective assistance of counsel by prejudicing a defendant's case. Commonwealth v. Barkelbaugh, 584 A.2d 927 (1990); Commonwealth v. Evans, 2011 Phila.Ct.C.P. LEXIS 415 (2011) (when the event is so prejudicial to the defendant occurs during trial, only the defense may move for a mistrial, the motion shall be made when the event is disclosed. **Pa.R.Crim.P. 1118(B)**. Counsel's failure to seek a mistrial or seek cautionary instruction constitutes a waiver of all such claims on appeal); also Commonwealth v. Jones, 460 A.2d731, 741 (Pa.1983).

Petitioner's trial counsel left these remarks go unobjected to and failed to move for a mistrial due to prejudicial effect of bias on petitioner's jury, "counsel's failure to seek a mistrial appears to be unjustifiable, erroneous oversight in trial tactics", I regard this as a miscarriage of justice sufficient to warrant PCRA relief under Commonwealth v. Szuchon, 633 A.2d 1098 (1993) (proceeding resulting in conviction were so unfair that miscarriage of justice occurred which no civilized society can tolerate). Pennsylvania Courts have consistently held that they are to act 'promptly' to correct when a miscarriage of justice is shown.

6.  ✗All previous counsel were ineffective for failing to interview/investigate Isara Simpson-Perez regarding the "confession" letter and countless inconsistent statements, or to call her as a witness for jury, finder of fact, to determine her credibility in conjunction with **Pa.R.Evid. 803.1(1)**; the Commonwealth and lead investigator Detective Jason Paul relied heavily upon information provided by this witness in all her statements and interviews despite her countless versions of events. "We hold that counsel's failure to interview witnesses, including these witnesses, was ineffective 'arguably per se'." Commonwealth v. Perry, 644 A.2d 708, Id @ 392 (1994). A criminal defense lawyer has a duty to conduct reasonable investigations into their client's case, which extends to the law as well as the facts. See Strickland v. Washington, 466 U.S. 668 (1984). Petitioner repeatedly asserted to counsel the need for this witness to be called to testify, this concern was never addressed by previous counsel. This is petitioner's first opportunity to raise these cumulative ineffective assistance of counsel claims, under Commonwealth v. Grant, 813 A.2d 726 (Pa.2002) (abrogated Hubbard's rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where a defendant has new counsel, and instead held, "a defendant should wait to raise claim of ineffective assistance of trial counsel until collateral review." Id @ 738. Hence, petitioner's ineffectiveness claims of previous counsel are properly before this court.

7.    All previous counsel were ineffective for failing to attack Detective Jason Paul's credibility concerning his bias, inconsistent statements and perjured testimony at petitioner's preliminary hearing and throughout the entire trial. Commonwealth v. Lively, supra; and Walker v. Jones, supra.

8.    All previous counsel were ineffective for failing to request Forensic 'DNA' testing on evidence left at the scene by investigators, forensics and coroner's department. During the trial it was discovered that potentially exculpatory articles of evidence were left at the scene of crime that were supposed to have been secured into evidence. The tan plaid jacket, tank top, and piece of paneling, all of which were covering or underneath the victim's body were photographed and according to Forensics were seized with the victim's body. It was discovered that these articles of evidence, in fact, had not been logged into evidence and were still at the crime scene as photographed by investigators and shown at petitioner's trial. All previous this

counsel were aware and even questioned investigators regarding the failure to preserve this evidence yet counsel failed to move to have these exculpatory items tested and previous counsel were globally ineffective for their failure to preserve this evidence that could have potentially yielded results to exonerate petitioner. The Forensic testing of these items could have contributed to a defense on petitioner's behalf but counsel failed to act, prejudicing petitioner of his constitutional right to a fair and impartial trial.

Trial counsel's failure to obtain 'DNA' testing violated his confrontation and discovery rights under **Article I, § 9** of the Pennsylvania Constitution. "A chosen strategy by trial counsel will not be found to have lacked a reasonable basis unless it is proven that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Commonwealth v. Williams, 899 A.2d 1060 (2006); In petitioner's case, these key items were primary to petitioner's defense as these were the last items to have come into contact with the victim at the time of her death and *the last things to have come into contact with the rightful perpetrator in this crime*. These items should be tested as they could possibly identify trace, fiber or 'DNA' evidence that could potentially exonerate this petitioner.

In Commonwealth v. Scarborough, 64 A.3d 602 (2013), the Court granted petitioner's request for Post-Conviction DNA Testing under **§9543.1**, the Court stated, "After an evidentiary hearing, a defendant's motion was granted upon a determination that the results could be exculpatory to the inmate, based on the Commonwealth's theory of the case." Clearly, after counsel had learned of this potentially exculpatory material untested evidence, all previous counsel were ineffective for failing to preserve this evidence and for not pursuing a motion to have these items tested. Counsel were aware of this evidence lying at the scene of crime per their investigator, yet never moved to have these items seized and tested nor pursued this matter in any regard. Clearly, counsel had no interest in determining whether petitioner was actually innocent but rather was in a rush to judgment all to the prejudice of petitioner.

In **42 Pa.C.S. § 9543.1**, an individual of a criminal offense in a Court of the Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing Court for the performance of 'DNA' testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

Results could be exculpatory to offender according to the Commonwealth's pure speculation in their theory of this case makes a prima facie case that the identity of a perpetrator of the crime was at issue at trial and the 'DNA' testing of these items, specific evidence, could have possibly yielded exculpatory, [exonerating] results, and would establish petitioner's actual innocence to the case in question as asserted by petitioner consistently since the onset of this investigation. Even any confession, even if previously and finally adjudicated as voluntary, which in petitioner's particular case there wasn't, it does NOT constitute a per se bar to establishing a prima facie case of actual innocence and the convicted person may, therefore, obtain testing under the Pennsylvania Post-Conviction DNA Testing Act: **42 Pa.C.S. § 9543.1.**

Clearly, counsel were ineffective and petitioner is entitled to immediate relief on behalf of this claim, standing alone, is sufficient.

9.     All previous counsel were clearly ineffective for failing to effectively cross-examine **ALL** Commonwealth witnesses on their lies and inconsistent statements to the police and trial court, Lively, supra.

10.     All previous counsel were ineffective when they failed to motion or move the trial court in **ANY** pre-trial motions attacking that the evidence was more than insufficient to meet the elements of this offense, or utilizing a State Habeas Corpus in accordance with **Article I, 14**, of the Pennsylvania Constitution.

11.    All previous counsel were ineffective for not requesting that petitioner's recorded voicemail messages to the Office on Area of Aging, and to the police be played "in full" for the jury to receive the full and correct context of the messages rather than just the points of these recordings that were favorable to the Commonwealth; See, <u>Kimmelman</u>, 477 U.S. 385, "court should not supply 'strategy' counsel did not factually have"; <u>Thomas v. Varner</u>, 428 F.3d 491 (2005); and, <u>Laird v. Horn</u>, 159 F.Supp.2d 58, 116 (2001).

12.    All previous counsel were ineffective for failing to move the trial court for funds to retain a "voice identification analysis" expert to examine the audio which Commonwealth's witness, Elena Welch, heard a mans voice in a voicemail message, (See exhibit W attached herein), state "and you never will" referring seeing the victims face, to rule out petitioner as the individual who utters this remark.

While the trial court need not authorize an expenditure under <u>18 U.S.C. §3006A(E)</u>, for a mere "fishing expedition" it should "NOT" withhold its authority when the underlying facts reasonably suggest that further exploration may prove beneficial to the accused in the development of a defense to the charge. <u>U.S. v. Thurmon</u>, 413 F.3d 752 (2005). In petitioner's case, on a day that petitioner placed a call to Area of Aging to leave a voicemail message for Elena Welch, he was explaining to Elena that if she looked on YouTube you could see a video of Petitioner and victim but that her face was not visible, all while someone in the background yells, "and you never will" when petitioner stated to Elena that you couldn't see her face. There were multiple individuals on the porch when petitioner was leaving the message and is unaware of who made the statement but knows that he did not say the comment. But surely someone who commented that nature could be a potential suspect for police to investigate.

It is defendant's burden to establish that an expert is necessary for an adequate defense. In analyzing a claim that <u>18 U.S.C. §3006A(E)(1)</u> was violated, the court considers whether defendant demonstrated a reasonable probability that the requested expert would aid in his defense and that denial of the funding would result in an unfair trial. Surely, petitioner's rights were violated and previous counsel were ineffective for failing to make this request to this Court despite petitioner's claim that he did NOT make this statement. Clearly, petitioner was denied a fair trial on behalf of all previous counsel.

13.    All previous counsel were ineffective for failing to permit the petitioner the opportunity/right to participate and be part of his voir dire process and assist in his own defense. Petitioner attempted multiple times to discuss his case with counsel and try to offer insight he had, he was told to "shut up" by trial counsel during voir dire. Petitioner was denied involvement in the selection of his jury in violation of his United States Constitutional Amendments **First, Fourth, Fifth, Sixth, and Fourteenth**; and Pennsylvania Constitution **Article I, § 1, 6, 9, 14 and 26**; and in violation of **Pa.R.Crim.P. 602**. See, <u>Commonwealth v. Hunsenberger</u>, 58 A.3d 32, 39-40 (2012) (clear right to participate in the jury selection process).

14.    All previous counsel were ineffective for failing to motion the trial court for funds to retain a psychiatrist/psychologist to conduct an evaluation to explore any other possible defense for this petitioner to the case in question in accordance with, **Pa.R.Crim.P. 569**.

15.    All trial counsel were clearly ineffective for failing to immediately move the trial court for Judgment of Acquittal/Arrest of Judgment for the sufficiency of the evidence was so contrary to the jury's verdict in accordance with,  **Pa.R.Crim.P. 606**.

16.    All previous counsel were clearly ineffective for failing to activate/litigate an Omnibus Pre-Trial motion requesting:

> (i)    Suppression of evidence;
> (ii)    Psychological Evaluation;
> (iii)    To Quash/Dismiss an Information;
> (iv)    For the Appointment of Private Investigator;
> (v)    State Habeas Corpus.

17,    All previous counsel were ineffective for failing to motion the trial court for a mitigation specialist or failing to present any mitigating evidence to the Court.

18.    All previous counsel were clearly ineffective for failing to challenge the credibility, effectively, of **ALL** of the Commonwealth's polluted, corrupt, or jailhouse snitch testimony.  In this case the Commonwealth utilized two jailhouse informants and two others with pending charges in the same office for which they were testifying.  Two jailhouse informants plotted together against petitioner to befriend and deceive the information from petitioner.  In Commonwealth v. Franciscus, 710 A.2d 1112, 1119 (Pa. 1998) ("harvesting information via jailhouse informants from defendant's post-indictment, and without counsel, violates **Article I, §9** of the Pennsylvania Constitution.  Also, in State v. Marshal, 882 N.W.2d 68, 81-83 (2016) (explaining that "the problem, along with questions of reliability, have given rise to requiring some corroboration of jailhouse informant testimony to support a conviction in at least eighteen states"), not only is there no corroboration in petitioner's case but also petitioner had an attempted to get counsel to call a witness that would have discredited the jailhouse informant's testimony, counsel failed to call said witness.  Along with the two jailhouse informants, there were two other witnesses who had pending charges in the same office for which they were testifying at the time of their testimony, Maurice Dotson and Ben Palmer, the latter of which was a potential suspect in this case clearly with an interest and bias in the outcome... In Davis v. Alaska, 415 U.S. 308 (1974), the United States Supreme Court explained that, "pending witness' criminal cases within the same jurisdiction is always admissible to establish the witnesses bias and their motive to fabricate."
Clearly, all previous counsel were ineffective in respect to these polluted sources and entitles petitioner to relief under the PCRA.

19.    All previous counsel were clearly ineffective for failing to interview/investigate potential witnesses, as well as, the evidence or lab report to the alleged crimes identified and outlined in the bare discovery issued and relative to this case, thus failing to uncover and familiarize themselves with potentially exculpatory evidence and properly determine and prepare the most effective and adequate defense.  See, Scott v. Wainwright, 698 F.2d 427, 429-430 (1983) ("Trial counsel's failure to learn the facts and familiarize himself with the law in relation to the case CONSTITUTES ineffective assistance of counsel...").

20.    All previous counsel were ineffective for failing to request charge to jury on lesse various degrees of Criminal Homicide.

21.    All previous counsel were clearly ineffective for failing to call a potential witness that would have offered testimony to prove and discredit the Commonwealth's jailhouse informant's testimony.  Counsel were made aware of this potential witness yet failed to subpoena this witness to testify on behalf of defense.  Under Commonwealth v. Chmiel, 30 A.3d 1111 (Pa. 2011) (stating to prevail on an ineffectiveness claim for failure to call witness, appellant must prove: [1] witness existed; [2] witness was available; [3] trial counsel knew or should have known of witness's existence; [4] witness was prepared to cooperate and would have testified on appellant's behalf; and, [5] absence of testimony prejudiced appellant) Id. @ 1143.
First prong, the witness was housed with petitioner and the two jailhouse informants at the Dauphin County Prison; Second, he was incarcerated and just as available as petitioner to offer testimony; Third, petitioner immediately informed counsel of witness and requested he be called to testify on behalf of petitioner.  Petitioner even informed the trial of the witnesses existence when informing the Court of problems with Counsel.  N.T. p. 928-941.  Fourth, witness expressed his desire to cooperate and offer testimony to prove and discredit the jailhouse informants; and finally, petitioner was prejudiced by the fact that without hearing this witness' testimony they had received a one-sided story and the jury, finder of fact, may have found petitioner's witness more credible than the two jailhouse informants that had motive and something to gain, this undermined the confidence of the verdict.  Petitioner has established the (5) prongs to meet a prima facie burden in establishing trial counsel's ineffectiveness.

22.    Trail counsel were "globally" ineffective when failing to dismiss a juror on grounds of juror misconduct after the trail court discovered and raised concern of this juror falling asleep during crucial, material testimony offered by Dennis C. Dickmaat, Ph.D., D-ABFA, from the Mercyhurst Forensic Anthropology Laboratory located in Erie, Pennsylvania. This anthropological doctor offered vital testimony regarding the injuries, possible cause of death, peri-mortem trauma that occurred at or around the time of death.  This expert offered testimony from Blunt Force Trauma, broken bones, patterns observable and their conclusion, if
This juror was caught sleeping during this crucial tesimony and nobody will ever know as to what piece of tesimony [information] he/she may have heard that would have created reasonable doubt. N.T.p. 647, L's 1-7. (See exhibit X attached herein.)
Counsel was immediately made aware of this issue and downplayed the significance of this crucial error.  This juror misconduct coupled with counsel's deficient performance caused petitioner severe prejudice and resulted in reversible error mandating relief.  Obviously, this deprived petitioner of a fair and impartial trail when one of the jurors that decided his fate slept during crucial testimony missing vital facts that could have caused this juror a miniscule of doubt needed.
In Console, 13 F.3d @ 666, this Court stated, the trial judge has discretion…to decide how to deal with a situation in which there is an allegation of juror misconduct…[and] this discretion extends to the determination of whether prejudice has been demonstrated; Clearly, the judge was concerned and sensed prejudice to petitioner as she was more than willing and offered to strike this juror but counsel downplayed the significance of this atrocious error; United States v. Bradley, 176 F.3d 225, 230-231 (3rd Cir. 1999) (holding that a sleeping juror may properly be

stricken under, **Fed.R.Crim.P. 24(c)**, based on ability to perform their duties); United States v. Freitag, 230 F.3d 1019, 1023-1024 (7th Cir. 2000). N.T. p. 647, L's 1-7. This misconduct coupled with counsel's blatant disregard for petitioner's constitutional rights to a fair and impartial trail and the right to "effective" assistance of counsel undermined the confidence in the verdict and mandates immediate relief. "Nothing that an indigent defendant was entitled to counsel in an initial post-conviction petition, the court held that right to counsel included "the concomitant right to 'effective' assistance of counsel." Commonwealth v. Albert, 561 A.2d 736, 738 (1989).

23.    All counsel were ineffective for failure to request this Court for a limited instruction on the use of prior inconsistent statements or cautionary instruction; Lively, supra.

24.    Trial counsel were ineffective for failing to pursue/request a cautionary instruction on the use of polluted, bias sources although two of Commonwealth's lead witnesses are jailhouse informants, Ian Munz and Corey Williams, whose testimony and statements were heavily relied upon by the prosecution, were all pending serious charges and time in prison at the time they offered statements. Commonwealth's witness, Ben Palmer, who had pending charges in the same office as he was testifying for at the time of testimony and whom was investigators possible alternate suspect to the crime in question, and thus failing to present evidence of dishonesty, crimen falsi, bias, mental health and propensity for violence. Commonwealth's witness, Maurice Dotson likely also had pending charges at the time of testimony in same office as the prosecutor he was testifying for. Davis v. Alaska, supra, (pending witness' criminal cases within the same jurisdiction always admissible to establish the witnesses bias and motive to fabricate); State v. Marshal, supra, (explaining that "the problem, along with questions of reliability, have given rise to requiring some corroboration of jailhouse informant testimony to support a conviction in at least eighteen states); ("harvesting" information vial jailhouse informant from defendant's post-indictment, and without counsel violates **Article I, §9**, of the Pennsylvania Constitution). Commonwealth v. Fransciscus, supra. Clearly, counsel had to tactical basis for failing to act in petitioner's defense.

25.    All previous counsel were ineffective for failing to object to the trial judges bias and partial participation in petitioner's entire trial.

26.    All previous counsel were prejudicially ineffective and rendered constitutionally deficient performance when failing to motion the trial court for suppression of evidence to challenge the admissibility of inculpatory statements made to police while intoxicated and under extreme duress.
Petitioner was intoxicated and under extreme duress from the discovery and loss of victim, which is evidenced by the multiple consistent statements throughout entire case of petitioner being under the influence heavy alcohol consumption at the time of his statements to police, as well as, had been crying and deeply distraught and upset over the loss of his paramour. He resided with the victim for the past 18 years and had a significant history with the victim. All previous counsel should have moved the Court early on to have all of petitioner's statements suppressed as they were not knowing, intelligent, or voluntary as per Miranda.
Trial counsel were clearly ineffective for failing to advise, raise, and litigate a pre-trial motion to suppress statements based upon an invalid and involuntary Miranda waiver and/or

where his statements were otherwise involuntary. This is evidenced by the clear sporadic behavior during the disclosure of these statements. Notwithstanding the foregoing, the interrogation with petitioner continued, even after this discovery of the body of his paramour, and petitioner made excessive alleged inculpatory statements but there was never a challenge to the <u>Miranda</u> waiver or the voluntariness of his statements were ever challenged, raised or litigated. Petitioner's alleged incriminating information utilized against him and was integral in the investigation and served as the <u>centerpiece</u> of Commonwealth's case-in-chief.

It is rudimentary that an individual's intoxicated state and emotional distress, among other factors, may affect a knowing and voluntary waiver of <u>Miranda</u> and may otherwise impact whether the statements were made voluntarily. See, <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979) (waiver of <u>Miranda</u> determined by looking at the totality of the circumstances; <u>Beecher v. Alabama</u>, 408 U.S. 234 (1972) (confession suppressed where accused made statement shortly after morphine injections); <u>United States v. Montoya-Arrubla</u>, 749 F.2d 700 (11th Cir. 1985) (intoxication considered as possible evidence of an invalid waiver); <u>Commonwealth v. Davenport</u>, 295 A.2d 596, 599, n. 4 (Pa. 1992) (consumption of alcohol noted in statements and evidence of defendant's scrawled signature indicia of intoxication); <u>Sample v. Eyman</u>, 469 F.2d 819, 821 (9th Cir. 1972) (<u>man's severe emotional distress following his wife's death precluded a finding of a knowing and intelligent waiver of Miranda rights</u>); <u>Commonwealth v. Smith</u>, 368 A.2d 272 (Pa 1977) (defendant's mental condition precluded voluntary statement).

Under the totality of the circumstances, the failure to file and litigate a motion to suppress petitioner's statements, violated his state and federal constitutional rights against self-incrimination. See, <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986) (ineffective assistance for failure to motion to suppress physical evidence); <u>Commonwealth v. Boyer</u>, 962 A.2d 1213 (Pa. Super. 2008) (ineffective assistance for failing to raise <u>Miranda</u> challenge even though confession was challenged under the <u>**Sixth**</u> Amendment right to counsel theory); <u>Commonwealth v. Grassmeyer</u>, 402 A.2d 1052 (PA. Super. 1979) (<u>finding arguable merit to ineffectiveness prong where counsel failed to file motion to suppress statements where there was evidence of intoxication</u>); <u>United States v. Mercedes-DeLaCruz</u>, 787 F.3d 61 (1st Cir. 2015) (failure to move to suppress defendant's statement was ineffective assistance); <u>Tice v. Johnson</u>, 647 F.3d 87 (4th Cir. 2011) (failure to file motion to suppress defendant's confession was ineffective assistance).

Petitioner's constitutional rights were clearly violated as the result of ineffective assistance of counsel when counsel failed to adequately advise, investigate, and pursue the suppression of the foregoing evidence. See also, <u>Commonwealth v. Nelson</u>, 574 A.2d 1107 (Pa. Super. 1990). Clearly, petitioner is entitled to immediate relief.

27.    All previous counsel were ineffective when failing to explore/attack culpability issues under **§308**, to investigate voluntary intoxication as relevant factor in petitioner's defense.

All previous counsel failed to realize that the issue of petitioner's intoxication and emotional duress could affect his ability to form specific intent necessary for the general count of Criminal Homicide. In this case, the evidence is substantial per multiple witness' statements to police that petitioner was under the influence of a considerable amount of alcohol during this entire period. In petitioner's particular case counsel should have advised petitioner that his intoxication could have negated certain element to reduce the count of Criminal Homicide, generally.

In <u>Commonwealth v. Ruff</u>, 405 A.2s 929 (Pa. Super. 1979) the Court held, "under **§308**, voluntary intoxication may reduce murder from first to third degree murder." **§308**, states that if

intoxication is present it may reduce murder from first to third degree; this can be used and is relevant to reduce murder from a first to a third degree, counsel were clearly ineffective in as much as they were unaware/unfamiliar with Pennsylvania Statutes involving intoxication and culpability. See, Harrich v. Wainwright, 813 F.2d 1082 (1987) (Trial counsel's failure to research and understand the law based on defendant's intoxication defense may constitute ineffective assistance of counsel and required an evidentiary hearing); "Trial counsel's failure to present evidence that defendant was an alcoholic and had drank too much, and failure to investigate an insanity defense, which would have explained state of mind at the time of crime constituted ineffective assistance of counsel." Wood v. Zahradnick, 611 F.2d 1383 (1980); Similarly, in Ford v. Lockhart, 861 F.Supp. 1447 (1994) the Court held, "Trial counsel's failure to raise intoxication defense may amount to performance below an objective standard of reasonableness but defendant must establish prejudice."

Counsel were unfamiliar with this relevant factor despite countless statements that petitioner was under heavy influence at or around the time victim was found. "Evidence of voluntary intoxication and/or drugged condition may be used to reduce murder form a higher degree to a lower degree, as a person overwhelmed by the effects of alcohol or drugs cannot form specific intent to kill." Commonwealth v. Lytle, 663 A.2d 707 (1995); See also Commonwealth v. Odrick, 599 A.2d 974 (1991) the Court held, "defense of intoxication can reduce level of homicide form first to lesser grade."

Clearly, counsel were ineffective and had it not been for counsel's "epic" cumulative ineffectiveness petitioner's outcome would likely have been different. Petitioner is entitled to immediate relief on his claims.

28.    All of petitioner's previous counsel were ineffective and operated under a reasonable standard of performance for failing to activate any pre-trial motions to quash the Information charging petitioner with First Degree Murder, when it is clear and obvious from all of the salient facts of record that Commonwealth did **NOT** have a prima facie case against petitioner nor could it meet the elements of the offenses and had it not been for the breakdown in this investigation and trial, and if petitioner would have received a fair and impartial jury trial the outcome of these proceedings would have been different.

In this case petitioner was denied the effective assistance of counsel as guaranteed by **Article I, § 9**, of the Pennsylvania Constitution and the **Sixth** and **Fourteenth** Amendments to the United States Constitution. See Strickland, supra; Williams v. Taylor, 529 U.S. 362, 395 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); and Commonwealth v. Pierce, supra.

29.    All of previous counsel were clearly ineffective and rendered deficient performance for failing to introduce into evidence: police reports, lab report, coroner's report, and private investigation reports, which all contradict and challenge the credibility of the Commonwealth's pure speculation and the witness' unreliable proffered statements, which was

34.

all to the prejudice and detriment to petitioner's defense and constitutional right to effective assistance of counsel. Strickland v. Washington, 104 S.Ct. 2052 (1984); Commonwealth v. Pierce, 527 A.2d 973 (Pa.1987); and Evitts v. Lucey, 105 S.Ct. 830 (1985).

30.   Finally, all of previous counsel were extremely ineffective and disregarded ALL communications, concerns, desired path, evidence or defenses that petitioner had written about in his dozens of letters to all previous counsel to no avail, as evidenced by the record; failed to reasonably communicate or infer with client or prepare for upcoming trial; hadn't even met with petitioner within sixty (60) days or more before trial, and thus, failed to consider or take into account ANY position or information petitioner attempted to relay into any possible plan of action.

There was a breakdown in the client-lawyer relationship and irreconcilable differences surfaced early on. Petitioner attempted to communicate information key to his case countless times with no satisfaction before petitioner began sending correspondence through the Clerk of Court to have these irreconcilable differences and broken client-lawyer relationship on record as evidenced by the docket sheet, for the record to show all written communication from petitioner to all previous counsel.

Petitioner attempted to reach the Judge regarding the conflict early on with no response. This irreconcilable conflict continued and escalated and finally surfaced late in the proceedings where the petitioner expressed all this concern in open court with the trial Judge with no resolution. N.T.p. 928-941. In Commonwealth v. Wesley, PICS Case No. 05-0706 (C.P.Centre.May.4.2005), the Court held, "Petitioner was entitled to a new trial because of ineffectiveness of counsel, where trial counsel failed to maintain communication with petitioner and failed to prepare petitioner properly for trial." This Court found evidence that trial counsel was ineffective because, lack of adequate preparation for trial, as evidenced by counsel's failing to prepare defendant to testify on the first day of trial. Similarly, in petitioner's case counsel hadn't met with him (3-4) months prior to trial, counsel would not return letters, and petitioner nor counsel were prepared nor did they know if petitioner would even be testifying as evidenced by the record. That Court additionally held, "Pennsylvania Rules of Professional Conduct: 1.14(A) requires an attorney in such a situation to 'maintain a normal client-lawyer relationship.'"

This is petitioner's first opportunity to raise the ineffectiveness due to the trial Judge rejecting his concerns. They are properly before this Court. See Commonwealth v. Adams, 2013 Pa.Dist.Cty, LEXIS 75, claims of ineffective assistance of counsel for Post-Conviction Relief must be raised in a collateral proceeding and not on direct appeal. See also Commonwealth v. Grant, supra.

Pursuant to Pa.R.Prof.Cond. 1.2: [A] subject to paragraphs [C] and [D], a lawyer shall abide by a client's decisions concerning the objectives of representation, and, as required by [Rule 1.4], shall consult with client as to the means by which they are to pursue...In this case when petitioner attempted to assist in his own defense in voir dire or request a certain action he was met with hostility and told to "just shh" or "shut up". Counsel would not take into account

important information petitioner had regarding his state of mind, potential witnesses, when there were lies to be cross-examined et cetera. But again petitioner was met with hostility and his concerns went unattended.

Petitioner attempted to bring the conflict to the trial Judge to no avail, as evidenced by record, N.T.p. 928-941, but had no success. Under **Rule 1.3**: A lawyer shall act with reasonable diligence and promptness in representing a client; **[1]** A lawyer shall pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and take whatever lawful and ethical measures as required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf;....and **Rule 1.4, [A]** A lawyer should: **(1)** promptly inform the client of any decision or circumstances with respect to which the client's informed consent, as defined in **[Rule 1.0]**, is required by the rules; **(2)** reasonable consult with the client about the means by which the 'client's' objectives are to be accomplished; **(3)** keep the client reasonably informed about the status of the matter; **(4)** promptly comply with reasonable requests for information; and **(5)** consult with client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by **Pa.R.Prof.Cond.**; **(5)(B)** A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. All of which were violated to the most extreme extent.

Your petitioner, David Barksdale, seeks review of these grounds and subsequent claims under the well-established **Sixth** Amendment law. Strickland v. Washington, 466 U.S. 668 (1984) (citing Williams v. Taylor, 529 U.S. 362 (2000)). Pennsylvania applies a three-prong standard to [claims] of ineffectiveness, in which the Supreme Court has held:

> "In order to establish a claim of ineffectiveness under the PCRA, an Appellant 'must' show that: [1] the claim is of arguable merit; [2] that counsel had 'no' reasonable strategic basis designed for their action(s) or inaction(s); and [3] but for counsel's err or omission(s), there existed a 'reasonable probability', that the outcome of the proceedings would have been different." Citing Commonwealth v. Kimball, 724 A.2d 326, 333 (Pa.1999).

Therefore, prejudice under the Strickland standard is 'NOT' an outcome determinative test.[9] See Strickland, supra. Thus, the question is 'NOT' whether representation by effective

---

9. Williams, 529 U.S. 406, outcome determinable test for ineffectiveness claims inconsistent with the **Sixth** and **Fourteenth** Amendments; Strickland, supra.

assistance of counsel would have "more likely than not" changed the outcome. Id...instead, prejuduice is established where the confidence in the outcome is so undermined [because] of counsel's deficiencies. Id. @ 694. Thus, the undermined confidence standard prejudice "is 'NOT' a stringent one, it is less than the preponderance standard." *Hull v. Kyler*, 190 F.3d 88, 1110 (3rd Cir 1999) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). Aslo, see *Jackson v. Horn*, 395 F.3d 92, 105 (3rd Cir. 2005) (prejudice under Strickland is 'NOT' a stringent standard). Thus, petitioner need "ONLY" to show that a probability existed sufficient to undermined confidence in the outcome as Strickland does 'NOT' set a high bar with great repsect to the prejudice and performance prongs. See aslo, *Thomas v. Varner*, 428 F.3d 491, 502 (3rd Cir. 2005).

**PCRA counsel Kristen Weisenberger, Esq. ID #84757, was ineffective for misconstruing petitioner's PCRA claims by infusing issues into one claim, thereby failing to argue the substantive merit of each of the petitioner's claims individually.**

(See 1925(b) statement exhibit L attached herein)

As a general matter, a Ferderal District court may not concider the merits of a Habeas petition unless the petitioner has "exhusted the remedies availiable in state cout". See U.S.C. § 2254 (b)(i)(a) *O Sullivan v. Boerkel*, 526 U.S. 838, 842 1119 S. Ct. 1728, 144 L.Ed, (1999) A petitioner satisfies the exhustion requirement "only" if [the petitioner] can show that [he or she] fairly presented the federal claim to the state courts.

Specifically, claim #19 of Petitioners Amended PCRA, *Trial counsel was ineffective for failure to investigate reports*, was infused into claims G & J of the 1925(b) statement. Regarding claim #29 of Petitioner's Amended PCRA, *trial counsel was ineffective for failing to introduce lab, police reports,* was not raised in the 1925(b). In Grazier hearings held 8/2/21 (N.T. pg. 8 L's 3-14) Petitioner questions counsel's neglect to include claim #29, informs the court of counsel's failure to incorporate those reports being the crux of Isaura Simpson-Perez's statement to police. Notwithstanding, the court ignores the neglect of counsel, and proceeds to force the defendant to choose self representaciton. (N.T. pg. 8 L's 15-19)

(See exhibit M attached herein)

In claim G of counsel's 1925(b) statement, which supports Petitioner's pro se Amended PCRA claim #30, *counsel was ineffective for failing to prepare for trial*, counsel neglects to specify or develope how trial counsel was ineffective, therefore never arguing the merit of the claim within the 1925(b) statement. Counsel abandon all other claims against the petitioners best interest.

Therefore, petitioner has plead and proven material factual issues for review, and is entitled to a New Trial on all of the grounds and subsequest claims, the ineffective asistance of counsel, and State and Federal Constitutional err's outlined herein. These claims have not been properly litigated; See *Commonwealth v. Simmons*, 459 A.2d 14, 16 (Pa.Super 1983) (ineffectiveness of counsel claim not previously litigated, even though similar claim was rejected on direct appeal, as inadequate presentation of an issue by counsel gives rise to an independant claim for relief.) "An issues cannot be previously litigated in a proceeding in which the defendant is represented by ineffective assistance of counsel." *Commonwealth v. Klinger*, 470 A.2d 540, 550 (Pa. Super 1983)

**GROUND 5: PETITIONER WAS DENIED HIS STATE AND FEDERALLY-CONSTITUTIONAL RIGHTS WHEN THE TRIAL COURT AND ALL PREVIOUS COUNSEL PERMITTED THE COUNTLESS INSTANCES OF INCONSISTANT, AND PERJURED STATEMENTS, AND TESTIMONY TO GO UNATTENDED/OBJECTED TO DURING THE PETITONER'S TRIAL.**

Your Petitioner avers that an unconstitutional breakdown occured during petitioner's trial in violation of his state and federal constitutional rights rendering his entire trial and subsequent conviction fundamentally-unfair and inherently unreliable that no civilized society can tolerate, when the Commonwealth rests its case off the counstless inconsistent, contradicting and perjured testimony, statements from incredible, and unreliable witness.[1] All the Commonwealth's witness's testimony consisted of perjuries, jailhouse informants, and multiple witness with significant mental health concerns. Said testimony and statements were the Commonwealth's **"ONLY"** circumstantial evidence" in this case in its entirety, and none of the witness presented by the Commonwealth offeres any reliable, credible proff beyond a reasbable a doubt.

This petitoner will plead (and will prove at an evidentiary hearing) that the proffered statements and testimony provided by all the Commonwealth's witness's was 'consistantly' inconsistent, contradicting, and at many times, false. The Commonweatlh soley relied upon all this to secure a wrongful conviction of petitioner,where, in the case did so undermine the truth determining process that NO reliable adjudication of guilt or innocence could have taken place by way of:

1.      Trial counsel were ineffectives for failing to object to and effectively cros-examine all of these inconsistent statemnts or conflicting, perjured testimony by Commonwealth wtiness: Michelle Black, Officer Mathew Gallup, Jailhouse informants  Corey Williams and Ian Munz, Kathy Dehaven, Tracy Mitchell, Detective Jason Paul, Isaura Simpson-Perez, Bonita  Crummel, Maurice Dostson, Benjamin Palmer, and prosecuting Attorney Canavan. These Commonwealth witness were confronted with many inconsistancies and conflicting testimony in which the Commowealth soley relied upon as the primary evidence to secure a conviction against petitioner. Petitioner was prejudice as he was denied a fair and impartial jury trial in violation of his constitutional rights under the **Sixth** and **Fourteenth** Amendments to the United States Constitution and **Article I,** § **6** and **9** of the Pennsylavnia Constitution.

Under Lively, the use of prior inconsistent statements as substantive evidence was reversible error because statements were not either given under oath at a formal legal proceding

---

1. Impeachment by contradiction may be defined as the eliciting of evidence tending to prove facts inconsistent with the testimony of the witness being impeached. Com  v. Weiss, 611 A.2d 1218 (1992) (Evidence that contradicts other evidence previously given by another witness constitutes impeachment, regardless of the status of the witness as exports or laymen.) See also, Com v. Baxter, 640 A.2d 1271 (1994) (evidence directly contradicting witness is strongly impeaching.)

[hearing], reduced to a written, signed, and adopted by the declarant or recorded verbatim, ***Commonwealth v. Lively***, 610 A.2d 7 (1992). These aspects (inconsistent statements) raise substancial due process concerns. "This court reversed the conviction, holding that the trial court commited reversible error when it admitted, as substantive evidence, prior inconsistent statements made by certain witnesses, which did not conform to requirements to make the evidence sufficiently reliable." Lively, supra. None of these statements hold none of the hallmarks that are present in <u>Brady</u>. Your petitioner raises a substantial Due Process claim that prior inconsistent statements, standing alone, are insufficient evidence to prove guilt beyond a reasonable doubt. All of these witnesses credibility was dubious, at best. **Pa.R.Evid.803.1(1).**

During petitioner's jury trial, Officer Matthew Gallup was inconsistent in his testimony and his statements where he states in his report that, "While conducting a welfare check on Commonwealth's withness Tracy Mithcell, that she was, infact, alive, well and unharmed." Yet when testifying at trial he adamantly insist that he did not ever have any contact with Tracy Mitchell whatsoever; When confronted with the inconsistency, he is provided his report that he wrote and it states in pertinent part, "She was alive, well and unharmed", so he states to the trial court: "Okay, well apparently I did." <u>N.T. 944, L's 15-25</u>; and <u>N.T. p. 945, L's 1-13</u>.

Michelle Black testifies at petitioner's trial that her and petitioner "hadn't argued at all", inconsistent with her Vonluntary Statement, (See exhibit N attached herein), to police where she specifically states that her and petitioner got into an arguement the night of June 8th of 2014, clearly contradicting her trial testimony. <u>N.T. 181, L's 11-25</u>; and <u>N.T.p. 182, L's 1-12</u>.

Commonwealth's jailhouse informant, Corey Williams, was clearly inconsistent when he states in his Voluntary Statements, (See exhibit O, attahced herein) to police that petitioner told him he was going to tell investigators that the victim was in protective custody if asked; which directly conflicts with his trial testimony where he testifies that petitioner told him, he had no idea or "game plane" of what he was going to do. <u>N.T.p. 840, L's 1-24</u>.[2]

---

2. If a witness for the Commonwealth, either pusrsuant to a deal while criminal charges are pending against him, the accused is entitled to establishing those facts to demonstrate interest and bias. <u>Com v. Thompson</u>, 739 A.2d 1023 (1999)<u>; Com v. Lane</u>, 621 A.2d 556 (1993); <u>Com v. Hill</u>, 566 A.2d 252 (1989) (fact that witness was awaiting sentence admissible to prove potential bias.) <u>Com v. Coader</u>, 311 A.2d 896, 898 (1972) ("The rational...is that th jury should be allowed to evaluate whether the witness testified for the prosecution to gain favorable treatment in his own case.) The Commonwealth has consistently argued that it had no obligation to prove a motive in this case, this is true, however, that does not shield testimony from an assessement of its credibility, wieght, competency, especially in a case where there is no physical evidence tying the defendant to the crime. It certainly does not transform uncorroborated and contradicted speculation into competent and credible evidence. See <u>Simmons</u>, 508 F.Supp.@ 1207, ("the government case depends upon...uncorroborated testimony that, upon careful scrutiny, is subject to question of credibility."); "Ultimately, the court concludes that it would be a miscarraige of justice for the verdict to stand, as it rest predominately on the testimonies of witness who were impeached, stood to gain from providing testimony, and who collectively presentd a narrative that was greatly undermined by competent and unimpeached evidence in the record, namely the testimony of individuals who were actually connected to the 1220 house, the victims, or lived in the surrounding neighborhoods. See, <u>Simmons</u>, supra. (Where there is even the slightest chance that a miscarraige of justice may have occured, as in the case here, the court is obligated in the interest of justice to order a new Trial."); <u>U.S. v. Lewis</u>, 850 F. Supp.@d 709 (2012); "This occurs when the error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. @ <u>Kotteakos v. U.S.</u>, 328 U.S. 759, 776 (1946)

Along with co-conspirator, jailhouse informant Ian Munz, they deivised a plan to derive information from petitioner to take to the police. Their testimony is unrealiable and clearly bias as they have a motive for testifying in this case as they had pending charges, violations of parole, and incarcerated at the time of thier statements. The court has held in, ***Commonwealth v. Moose***, 602 A.2d 1265 (Pa. 1992) that, "Any secret interrrogation of the defendant from and after an indictment without the protection of counsel contravenes the basic dictates of the fairness in the conduct of criminal cases and the fundamental rights of persons charged with crime; If the United States Constitutions' <u>Sixth</u> Amendments is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse."

Kathy Dehaven states to investigators in her Voluntary Statement that she had last seen the victim on June 9th, 2014; when testifying at trial she states that she did not see the victim at all on June 9, 2014, only petitioner. <u>N.T.p. 758, L's 5-9</u>.

Again, Commonwealth's jailhouse informant, Ian Munz, was inconsistent on multiple occasions during his testimony. In his trial testimony he testifies that petitioner told him that an argument ensued between victim and petitioner over a purse. <u>N.T.p. 751, L's 19-25</u>; and <u>N.T.p. 752, L's 1-5</u>; in his Voluntary Statement to poice there wasn't ever any mention or any knowledge of any argument over any purse. (See exhibit P attached herein).

Secondly, his trial testimony again differed from what he disclosed prior to detectives when confronted with whether he had heard about petitoner's case from around his housing units [B-Block], in which he was housed at the Dauphin County Prison; he continued to lie under oath despite the verbatim transcrpits of interview with police. <u>N.T.p. 728, L's 23-25</u>; <u>N.T.p. 729, L's 24-25</u>; and <u>N.T.p. 730, L's 1-5</u>. See also, ***Haskell v. Superintendant Green SCI***, supra, (2019).

Lastly, Ian Munz states in his Voluntary Statement to police that his friend, co-jailhouse informant Cory Willams, told petitioner he was also in jail for a homicide case to try and get petitioner to open up to him, but again, while testifying at trail he states that he never said this, and when confronted with his prior Voluntary Statement and perjured testimony he responds, "If that's what it says there, than I believe you." <u>N.T.p. 735, L's 11-25</u>; and <u>N.T.p. 736, L's 1-6</u>. Also he stipulates that he recieves favorable treatment for his continued cooperation and repore with the police. In ***Commonwealth v. Williams, supra***, it states, "The trial courts inappropriate and substantial downplaying of a material impeachment concern in relation to such testimony seems to be an error of an essential structural magnitude, inpairing the integrity of the verdict."

Commonwealth's witness, Tracy Mitchell, stated in her statements to police that petitioner threaten her when he stated, 'If you keep messing with me, I'll kill you like I killed Peggy"; On another occasions she states that petitioner stated,"If you don't stop you'll end up like Peggy; then, once the witness was testifying at trial she testifies that petitioner denied to her of having any involvement with the victims death. The witness's credibility was brought into

question from the onset of her testimony as Court staff advised the trial judge she wasn't competent to testify. N.T.p. 690. See ***Commonweatlh v Williams***, supra. Regardless, this witness was permitted to testify despite her credibility and all the inconsistent statements to the police and to the court.

Commonweatlh witness Bonita Crummel and Maurice Dotson (husband and Wife) lied under oath when they testified that during a three-way call between Bonita Crummel, Michelle Black, and the victim (in which Maurice Dotson heard per speaker phone) that your petitioner had entered the victims residence and began yelling at the victim, proceeded to rip the phone from the victims hands, disconnecting the line, and this was the three-way call taken place on June 8, 2014, where the victim allegedly admits/discloses that the sex between petitioner and the victim was "not by choice' and how allegedly she sated that she was willing to cooporate in any investigation. Maurice also testifies that he witnessed this phone conversation, and the disconncetion caused by petitioner. However, phone records indicate that at the time of this three-way call, this petitioner was making calls from a residence approximately eight blocks away on Swatara during this conversation, (See exhibit Q 1 thru 6 attached herein), that transpired between Bonita Crummel, Michelle Black, and the victim which would completely undermin ANY argument that petitioner had been present at victims residence, disconnecting any phone, at or during the entire time of this phone converstion.

Commonwealth's witness and investigators potential suspect, Bemjamin Palmer, lied under oath when he testifies that he did not have victims phone number in his possession when he was arrested for unrelated offenses, despite officers report and property reciept when he's taken into custody. N.T.p. 433, L's 20-25; and N.T.p. 434, L's 1-6. See ***Commonweatlh v. Johnso***n, 727 A.2d 1089, 1094 (Pa. 1999) (In order to be entitled to a New Trial for failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of the witness may well have been determinative of his guilt of innocence.") This witness clearly had an interst and bias, as he was the last individual seen exiting the rear door of the victims residence on the day the victim goes "missing", admitted attempting to get money from the victim, and has a long history of violent crimes and robberiess against female victims, and has a strong propensity for violence. This witness again lies under oath when he states that nobody answered the door the day he was there so he left, contradicting Egene Moore's testimony where he testified that he witnessed this individual exiting the rear door of the victims residence on the day in question, and depart on his bike. Clearly, this witness's testimony is going to go directly to serve his own interest. Also, this wtiness had pending charges in the same office in which he was testifying for at the time of his testimony.

41.

Detective Jason Paul's main witness and second potential suspect, Isaura Simpson-Perez, repeatedly lied and changed her statements on many occasions. First, when the body of the victim is recovered, she informs Officer Miller that she went into the basement and observed a body near the washing machine, but she couldn't tell because it was covered up. Then she informs Detective Paul that she located the smell and had petitioner go check, and that he proceeded immediately to the rear of the basement and discovered the body. Next, she informs Detective Paul that her and petitioner witnessed the victim fall down the steps and *when realizing she was dead*, her and petitioner moved the victim's body to the washing machine. She then recants and denies ever moving the body.

When Isaura meets Detective Goshert, she insist that she had nothing to do with the victims death. But, when asked again if she knows how the body got down there she confirms, "I would say she may have fallen down the stairs." Then this witness proceeds to inform Detective Goshert and Detective Paul that she and petitioner located the victims body (4-5) hours before calling police, states the victim fell down the stairs, and that petitioner dragged the victims body to the rear of the basement. She continues to inform police that the victim did not suffer, and that she wanted to speak to the victim's granddaughter to let her know what happen, that she is sorry, and asked to be forgiven all in a written letter she writes in the presence of Detective Jason Paul.

(See exhibit I attached herein)

Isaura continues to change her story several times and next states that **SHE** found the body, but then waited (6-7) hours before calling police, then states her and petitioner wait (9) hours before calling police. Next she states to Detective Paul that she and petitioner went down the basement (4-5) more times to confirm what they had recovered. But then proceeds to inform Detective Goshert that she and petitioner went back and forth (6-7) more times.

On a later date, Isaura calls the office on Area of Aging to report that she had seen the "missing" victim leaving "OD's" bar on June 16, 2014, but that she didn't get to speak with her because the 83 year old decedent was moving too fast for her to catch up to. Then again, she recants and denies ever seeing the victim since June 9th 2014, but rather tells investigators that petitioner forced her to make that call. The Court's have held that; "An accused's' due process rights to a fair trial, including the right to confront and cross-examine witnesses and to call witnesses on his own behalf, is violated by a state court in a murder prosecution, requiring reversal of a conviction, in this case the defendant called a witness to introduce wintesses confession of the crime." *Chambers v. Mississippi*, 410 U.S. 248 (1973).

Isaura simpson-perez also lies to police on many occasions. First, she informs the detective that the victim and petitioner were a couple for many years, but when asked about the realtionship she responds that, "I thought they were just friends", but by the end of the inquiry she states, "they were, in fact, a couple for years." Finally, she informs Detectie Paul that petitioner came home on June 9, 2014, to call police and report the victim missing. **No calls** were ever made to police at this time.

42.

This witness, and at first potential suspect, gave numerous conflicting accounts of the events in question, including but not limited to, her written apology "confession letter where she wrote the victims granddaughter to tell her what happen, <u>that the victim did not suffer, and she is sorry for Ms. Peggy's loss, and hopes that she will forgive her</u>.

(See exhibit I attached herein)

This witness continued with countless versions of events and gave a strong indication that she knew what really happen to the victim. Yet, police investigator's failed to and abandonded any investigation into the significant amount of inconsistancies and outright lies. In ***Commonwealth v. Brown***, 52 A.3d 1139 (2012), this court explained, "a conviction which rest soley on the prior inconsistant statements of witness who testify at trial, where such statements were properly admitted, but recanted at trial, does not offend due process 'provided' the makers of such statements have been made availiable for cross examination, and, based on the content of the statements as a whole, a finder of fact could reasonably find that every element of the offense(s) charged has been proved beyond a reasonable doubt; such statements will **NOT** be sufufficient to sustain a conviction under the due proecess clause of either the United States Constitution's **Fourteenth** Amendment or **Article I, § 9** of the Pennsylvania Constitution.

Finally, Commonweatlh's wtiness and lead investigator, Detective Jason Paul, testified and lied under oath on multiple occasions at petitioner's preliminary hearing. First, this Detective lies when he testifies that the victim had a hard time getting up and down stairs, and that was why she does not go into the basement or sleep upstairs, right after he testified and witnesses stated that the victim got around really good and walked everywhere she went. He goes further by testifying that Commonwealth's wtiness, Tracy Mitchell, admitted that Petitioner confessed that he killed the victim. Clearly by the salient facts of record set forth in Tracy Mitchell's own Voluntary Statement, that is not clearly not what petitioner stated.

(See exhibit R attached herein)

At preliminary hearnig, Detective Paul, testifies that jailhouse informant Corey Williams, stated in his Voluntary Statement that petitioner told him that he had no way to get the victim's body out of the house, but when reviewing this voluntary statement of this witness, he makes **NO** mention of this statement. In fact, he simply alleges that petitioner stated he was going to wait until the body started stinking before moving it. <u>P.H.N.T.p. 26, L's 7-11</u>

Next, this detective states that petitioner left a voice message stating that the victim could be lying dead in the basement. But upon review of this transcript, it is clear that petitioner makes **NO** reference of mentioning of the victim being **"dead"** <u>P.H.N.T.p. 27,L's 3-7</u>

(See exhibit's S. S2 attached herein)

43.

Additionally, this Detective states that petitioner states in his Voluntary Statement that he thought it was a wet towel, and kicked it, saw a hand fall out and realized it was a body, but upon review of this transrcipt it is clear that petitioner makes **NO** reference or mentioning of a hand falling out, these parts were added by this Detective P.H.N.T.p. 34 L's 19-21.

(See exhibit T.T2 attached herein)

Finally, in numerous reports that police wrote, between Office Miller and Detective Paul, they clearly indicate in the salient facts of the record that Isaura Simpson-Perez found the body of the victim, yet in Detective Paul's testimony he testifies that this petitioner is the one who found the victim's body. P.H.N.T.p. 34, L's 14-15.

(See exhibit(s) U. U2, atttached herein),

Similarly, we get the same pattern of perjured, false misrepresentation of the facts by Commonwealth prosecutor Attorney Canavan, when he repeats this bias and improper misrepresentation of the facts during his closing argument when he states to the jury that petitioner admitted that he had "choked" the victim in a voicemail message. But, according to their own verbatim records petitioner made no admission or reference to "choking" the victim. In fact, the only reference he makes of "choking" is when he asked police to get involved to tell Bonita Crummel, and Michelle Black to stop going around the neighborhood spreading the word that he "choked" the victim, because thier rumors were causing threats on petitioner's life. Despite the fact that, that's **NOT** at all what petitioner stated, the prosecution knowlingly misrepresented the facts to prejudice the jur    in closing argument. N.T. 1137, L'a 15-20.

(See exhibit BB attached herein)

This prosecuting Attorney continued to misrepresent the facts a second time, knowing what he was stating during his closing argument was misrepresentation of the facts, knowing it was flase. See ***Commonwealth v. Correa***, ***supra***; and ***ABA Standards § 5.8***. DA Canavan stated in his closing argument that this petitioner stated, "I killed Peggy and I'll kill you too",. when in fact, there is "NEVER" any statement, interview, recording, or testimony where these words are uttered by petitioner. N.T. 1144, L's 24-25. Again, Attorney Canavan is knowingly misrepresenting the facts by adding/twisting statements to fit his own agenda, and sway the jury all while prejudicing the petitioner in front of the jury during closing argument to causing a grave miscarriage of justice, and denying petitioner's right to a fair and impartial jury trial. This is a blatant disregard for petitioner's Due Process rights, and an outright flagrant misconduct on behalf of the prosecution.

Your petitioner avers that the Comonwealth's two lead witnesses are jailhouse snitches which surely have an interest, and corrupt motive, in providing thier "stories" and an automatic bias. Secondly, Commonweatlh's witness, Isaura Simpson-Perez, whose statements were heavily relied upon throughout the entire course of petitioner's trial, was not availiable for any cross

-examination denying your petitioner his Constitutional rights to confrontation, due process, and equal protection. **Pa.R.Rvid. 803.1 (1).** These violations did significatnly undermined the confidence and truth-determining process that 'NO' reliable adjudication of guilt or innocence could have taken place. This conviction and/or continued affirmation of this wrongful conviction is based upon the flagrant violation of his rights, and is a miscarragie of justice in which a breakdown occured and this petitioner is entitled to immediate relief warranting a New Trial congnizable under 28 USC 2254 [2254]

This Petitioner has maintained from the onset of this investigation that he is actually and factually innocent of this crime, and has been wrongfully convicted. Petitioner's statements and testimony has remained the exact same without 'ANY' inconsistancies, or contradicting testimony unlike the Commonwealth's witness' testimony. Petitioner is entitled to a New Trial pursuant to 28 USC 2254 [2254]

## GROUND 6: IN PETITIONER'S PARTICULAR CASE HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION FOR FIRST DEGREE MURDER AND THE TRIAL COURT ERRRED WHEN FAILING TO GRANT PETITONER A NEW TRIAL FOR THE EVIDENCE IN THIS CONVICTION IS INSUFFICIENT.

This petitioner, David Barksdale, asserts herein that the evidence was insufficient to convict this petitioner, as a matter of law, and contends that there was a constitutional breakdown during the investigation, and following trial in this matter. There is no direct physical evidence that remotely links your petitioner to the offese(s) in question besides unreliable testimony offered by two jailhouse informants. The prosecution here centers it's entire case off their pure speculation into what they describe as a "motive" that the Commonweatlh fabricated to secure a conviction in this entirely circumstancial case against petitioner.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Court observed that, "Both direct and circumstantial evidence are concidered in determining whether evidence is sufficient to support a conviction. In petitioner's particular case, there is no direct or physical evidence to consider. This Court went further to state, "in examining the petitioner's sufficiency of evidence claim the appropiate inquiry is 'whether', after reviewing the evidence in light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Even in concidering the circumstantial evidence in light most favorable to the Commonweatlh, the Prosecution falls short of meeting the essential elelments necessary to secure a conviction for First degree Murder.

The prosecution's own witness negate the Commonwealth's suspected "motive" throughout the entire trial. There is direct testimony that would undermine any possible "motive" the prosecution attempted to present. Moreover, the following instances outline the insufficiencies in all of the evidence, or lack thereof, against petitioner and entitles petitioner to relief:

A.      In this case there is no physical evidence whatsoever to prove, or even suggest, that this petitioner caused the death of the victim. The investigators were unable to locate **"ANY"** witnesses to the events in question and "DNA" evidence was unable to be recovered due to the advanced state of decomposition of the victim. The investigators have no witnesses, no complaint, no confession or admission, no "DNA" evidence, no fingerprints, no weapon, and injuries to the victim are consistent with a fall forward motion.

(See exhibit(s) V attached herein).

The Commonwealth nor investigators have any evidence to say with any certainty how the victim sustained her injuries, nor do they offer *a "time of death"* of the decedent. There is no witness to support or corroborate any of the Commonwealth's pure speculation of what caused the injuries that the victim sustained. In ***Commonweatlth v. Farquharson***, 354 a.2d 545 (1976), our Supreme Court held; "whenever a jury verdict is based on evidence so unreliable that it renders the verdict inherently unreliable, a product of surmise and conjecture, the evidence is insufficient, as a matter of law, to sustain the verdict." In this case, the only circumstantial evidence offered is the inconsistant and perjured testimony offered by the Commonwealth's two jailhouse informants and other witnesses, which had pending charges, arrest, and/or probation at the time of their testimony. "Prosecution should have applied the stringent "reasonable hypothesis" test Okalahoma previousley used in circumstantial evidence cases, whereby such evidence sufficed for a conviction only if there was sufficient evidence to exclude every reasonable hypothesis but guilt", ***Easley v. State***, 2004 Ok. CR. 21 (2004); also in Jackson, supra, the court held that, "an essential of the due process guarenteed by the **Fourteenth** Amendment, no person shall be made to suffer the onus of a criminal conviction except upon specific proff, which is defined as the evidence necessary to convince a tier of fact beyond a reasonable doubt of the existence of every element of th e offense."

B.      There is no fatual basis for a conviction vor Murder in theFirst Degree where the Commonwealth has provided **"NO"** evidence to prove, or even suggest, beyond a reasonable doubt how this victim sustained her injuries. Petitioner assererted and has maintained from the onset of this investigation his actual innocence. He maintained that he did not kill the victim nor did he have any knowledge as to how the victim sustained her injuries, which could have just well been caused accidentally. Even the Commonwealth's own expert witness testified that the

injuries would have been intensified due to the osteoporotic condition of the decedent.

(See exhibit Y attached herein)

C.    Even though the identity of the perpetrator was at issue from the onset of the investigaton, investigators failed to ultilize any fingerprint analysis on any area of the residence where victim was found, resulting in no fingerprint evidence being availiable in petitioner's case. Thers is no evidence to determine, with certainty, the actual cause of the victim's injuries or even a time of death of when the event occured. If the petitioner is not provided with *a "time of death"* of the decedent, he has no was to offer an alibi defense for the time of death. In addition, there were two other alternate suspects in this case that were cleared without any alibi or any clearly convincing evidence that they had no invlolvment in the case in dispute. With there being no evidence to explain how or when the victim sustained her injuries, the Commonwealth has clearly failed to meet the burden and clearly could not have meet the element of specific intent to kill, and certainly cannot prove malice. "In order to prove the Offense of First Degree Murder, the Commonwealth must demonstrate the accused killed another human being with malice and specific intent to kill.' *Commonwealth v, Briggs*, 12 A.3d, 306 (2011).

D.    One of the aforementioned suspects, Isaura Simpson-Perez, and the one whom actually discovers the body, has a long mental history. In addition, the other, which was last seen exiting the rear door of the victim's residence on the exact date the victim goes "missing", he has a history of violent crimes against women, and has a strong propensity for violence. During the investigation, it is actually uncovered that this suspect, Ben Palmer, was attempting to get money from the victim, and when arrested for unrealted offenses, is found to have the victim's phone number and phone number of lead investigator in his possession.

E.    The Commonwealth's entier case is circumstantial, at best, and the prosecution rest of a theory that petitioner had knowledge of a pending investigation being brought against him for abuse and used this as their "motive" in this case, with finacial attributes. As petitioner's trial was ongoing, the Commonwealth's owen witness negate both elements of this possible "motive" by testifying that the victim and petitoner were a couple, of intimate nature, for years and that petitioner needed the victim "financially' to keep possession of their jointly owned property @ 107 North 13th Street in Harrisburg, PA., and had noting to gain by the victims death. Detective Jason Paul acknowledges the lack of evidence in petitoner's case when he testifies at the preliminary hearing that there is no physical evidence to link petitioner to victim's death. He also testified that this is an entirely circumstancial case and that there is not any witness, which will say that petitioner killed the victim. PH.N.T.p 5, L's 17-21. The prosecution essentially follows suit when they state in their openig statement to the jury that the Comonwealth's case is basically

47.

a "motive" case and is bsed sooley uon circumstantial evidence. N.T.p. 14, L's 5-6. In *Comonwwealth v. Packer*, 2017 pa. LEXIS 1942 92017) the court states, "Appellate review of a challenge tot he sufficiency of the evidenc to spport a conviction prequiers that an apppellate court determine whether the evidence adopted at trial, and all the reasonable inferenced derived therrrefrom viewd in favof of the Commonwealth, as verdict winner, supports the jury;s findings at at all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Comer*, 716 A.2d 593 (1998).

F.      When the prosecution based it's entire case as a "motive" case and that an abuse allegation and finacial exploitation are at issue, but Isaura Simpson-Perez, someone who was residing with and considerably close to the victim and petitioner, states in multiply interviews with police that petitioner and the victim were intimate and "have been a couple fo years", she was never called as a potential witness by either the prosecution nor the dfense.

(See exhibit Z attached herein)

G.      In petitioner's case the Commonweatlh hangs the outcome of its entire case on inconsistent and perjured testimony. Commonweatlh's case centers on the testimony from two jailhouse informants, both with pending charges and an obvious interest and bias; relies on testimony/statements from Isaura Simpson-Perez, who has significant mental health history, yet this witness is never called as a witness to be subject to cross-examination regarding her countless inconsistent statements; and the testimony of Commonwealth's witness Tracy Miitchell, an individual who has a long mental health history, and her compentency was at issue at trial because she has a long prior history of drug sales and prostitution, all of which is insufficient to convict your petitioner of First Degre Murder. See *Commonwealth v Kling*, 721 A.2d 763, 770 (Pa. 1998), "In all capital cases this court is required to conduct an independent review of the sufficiency of the evidence supporting a First degree Murder conviction." See also *Commonwealth v. Whitney*, 512 A.2d 1152 (Pa. 1986), Defendant's must "be afforded a meaningful opportunity to present a complete defense." *Snyder*, 963 A.2d@401 (qouting *California v. Trombetta*, 467 U.s. 479 (1984).

H.      Finally, the investigators conducted Forensic Luminal Testing at the "scene of the crime" and all the results for blood evidence were found to be inconclusive. (See exhibit(s) AA. AA2 attached herein) The forensic Anthropological Analysis that was conducted indicated at one point that the injuries "could" be consistent with a fall forward, but ultimately concluded that it does not indicate a fall in the nature of falling down the steps. (See exhibit(s) BB. B2); futhermore, if the injuries inflicted were as severe as noted, the fact that the luminol test was inconclusive would undermine any argument of this being the possible "scene of the crime" as there would surely be massive amounts of blood at the "scene of the crime" due to the nature and extent of the injuries described to the victims face. The doctor conducted the investigation into

time of death by the sudying of insect life cycles could not conclude a time of death of the victim to assist in this investigation.

I.        Furtheremore, there was clearly insufficient evidence to sustain a conviction and petitioner's due process rights were violated when the Commonwwealth and investigators had failed to preserve exculpatory evidence potentially beneficial to petitioner and his defense. Although countless police officials, prosecution, forensics, and Coroner's Office were present at the scene of the crime, and photographed articles of evidence and all relayed in their reports and testimony that said articles of evidence were collected with the victim's body, there were multiple article of evidence convering and tucked under the victim's body when they recovered the body. A tan jacket and piece of paneling were covering the victim's body and tank top laying underneath the victim, none of which were collected or logged into evidence to be tested for trace, fiber, or "DNA" evidence, despite official reports. The last person to come into contact with the victim and said articles could have left trace evidence that could have potentially exonerated petitioner had these articles been retrieved, placed into evidence, and subsequently tested for trace, fiber, or "DNA" evidence, or all these officials surely would have concidered when examining the scene.

        For the Due Process Clause of the United States Constitution's Fourteenth Amendment, in a criminal prosecution the presence or absense of bad faith on the part of the police with regard to the loss or destruction fo possible evidence must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it is lost or destroyed. "Under the Due Process Clause of the United States Constitution's Fourteenth Amendment, the good or bad faith of the state is 'irrelevant' when the state <u>fails</u> to disclose material exculpatory evidence to the defendant in a criminal prosecution." ***Arizona v. Youngblood***, 488 U.S. 51, 109 S.Ct. 333 (1988); The Court's were further to conclude, duty to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense," ***California v. Trombetta***, 467 U.S. 479, 104 S.Ct. 2528 (1984); <u>Ante</u>,@ 58, 102 L.Ed.2d.289, "there will be cases in which the defendant is unable to prove bad faith or that the state acted in bad faith, but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."

        J.        In this case, the investigators with years of experience, knowledge, and qualification left articles of evidence, in which they photographed and surely aware of exculpatory value, at the scene of the crime and are still lying at the secne of the crime where the body was found. There were items of clothiing, and paneling which were covering and under the victim, surely esteemed investigators would have concidered thier exculpatory value. When it had come to light that these items were left at the scene, despite reports, the Commonwealth proceeded to downplay the significance of the exculpatory nature of the evidence and rather, for a lack of a better term, passed the buck so to speak.

Thier material, key items were the very last things to come into contact with the victim (and true perpetrator), yet the Commonwealth failed to preserve this evidence by placing these items into evidence to be tested for any possible trace, fiber, of "DNA" evidence left behind to exonerate this petitioner. Petitioner was extremely prejudiced and denied a fair trial for the state's failure to preserve key articles of evidence. In **_RE Winship_**, 397 U.S. 358 (1970) (the evidence in this case was far from conclusive, and the possibility that the evidence denied respondent would have exonorated him, was not remote. The result is that he was denied a fair trial by the actions of the state, and consequently was denied due process of law.)

Clearly petitioner was denied his Due Process right and denied a fair trial. There is no factual basis to support the conviction of First Dgree Murder when the Commonwealth nor investigators offered any evidence as to how, when, where, of by whom these injuries were inflicted, and the only pieces of key evidence that could have potentially exhonorated petitioner and answered these questions, were left behind when the state failed to preserve key evidence.[2]

This conviction or continued affirmance is a grave miscarriage of justice that mandates relief under Pennsylvnia law. Therefore, all the inconsistant/perjured statements and testimony

---

2. An understanding of Due Process demonstrates that the evidence which was allowed to deteriorate was " constitutionally material", and that its absence significantly perjudiced respondent. The Court, with minimal reference to past cases and with what seems to be less that complete analysis, annouces that "unless a criminal defendant can show bad faith on part of the police failure to preserve potentially useful evidence does not constitute denial of due process of law." Ante @ 58, 102 L.Ed.2d 289. This conclusion is claimed to be justified because it limits the extent of poilce responsibility "to that class where the interest of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could not form a basis for exonerating the defendant." Ibid. The majority has clearly identified one type of violations, for police action affirmatively aimed at cheating the process, undoubtedly violates the constitution. But to suggest that this is the only way in which the Due Process Clause can be violated cannot be correct. Regardless of intent or lack thereof, police action that result in a defendant receiving an unfair trial constitutes a deprivation of due porocess. The court's most recent pronouncement is "what might loosely be called the area of contitutionallyy guaranteed acces to evidence. **_Unites States v. Valnzuela-Bernal_**, 458 U.S. 858,86 (102 S.Ct. 3440) (1982) as in **_Califonrnia v. Trombetta_**, 467 I.S. 479 (1984.) Trombetta answered the "question whether the **Fourteenth** Amendment...demands that the state preserve potentially exculpatory evidence on behalf of defendant's." Id. @481. Justice Marshall, writing for this Court, noted that while the particular question was one of first impression, the general standards to be applied has been developed in a number of cases including: **_Brady v. Maryland_**, 373 U.S. 83 (1963), and **_U.S. v. Agurs_**, 427 U.S. 97 (1976). Those cases in no way require that the government actions that deny a defendant's access to material evidence be taken in bad faith in order to violate due process. The Court in Brady ruled that "the suppression by the prosecution of evidence favorable to an accused uopn request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Id.@87. The Brady Court went on to explain that the principal underlying earlier cases, e.g., **_Mooney v. Holohan_**, 294 U.S. 103 (1935) (violates due process when prosecution presented perjured testimony), is "not punishment, of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." 373 U.S.@ 87. The failure to turn over material evidence "cast the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his actions is not the'result of guile," Id.@88 See **_Arizona v. Youngblood_**, supra. Hence, petitioner has suffered a Brady violation and violations to his due process rights requiring reversl in this case.

alone raise substantial due process concerns as they are, alone, insufficient evidence to [prove] the elements beyond a reasonable doubt. This is the first opportunity to raise the ineffectiveness due the PCRA judge rejecting his concerns in *Grazier* heairngs held 3/2/21, 8/2/21, and 7/25/22.

They are properly before this Court pursuant to **Pa.R.Prof.Cond. 1.2:** **[A]** subject to paragraphs **[C]** and **[D]**, a lawyer shall abide by a client's decisions concerning the objectives of representation, and , as required by **[Rule 1.4]**, shall consult with the client as to the means by which they are to pursue... In this case when petitioner attempted to have counsel include in the 1925(b) statement regarding Isaura Simpson-Perez's statement to police "she and David Barksdale witnessed Peggy Swann fall down the basement stairs, ***they realized she was dead***, and moved her body to the washing machine.," counsel would not take into account the exculpatory evidence petitioner had regarding this issue. *See Garzier hearing* held 8/2/11 <u>N.T.p.10, L's 23-25; N.T.p. 11, L's 1-3</u>.

Under **Rule 1.3**: A lawyer shall act with reasonable diligence and promptiness in representing a client; [1] A lawyer shall pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and take whatever lawful and ethical measures as required to vindicate a client's cause and endevour. A lawyer must also act with commitment and dedication to the interest of the client and with zeal in advocacy upon the clients behalf;... and **Rule 1.4,[A]** A lawyer should; (1) promptly inform the client of any decision or circumstances with respect to which the clients informed consent, as defined in **[Rule 1.0]**, is required by the rules; **(2)** reasonably consult with the client about the means by which the 'clients' objectives are to be accomplished; **(3)** keep the client reasonably informed about the status of the matter; **(4)** promptly comply with reasonable request for information; and **(5)** constult with the client about any relevant limitation on the lawyers conduct when the lawyer knows that the client expects assistance not permitted by **Pa.R.Prof.Cond.(5)(B)** A lawyer shall explain decisions regarding the representation. All of which were violated to the most extreme extent.

In ***Commonweatlh v. Bradley***, 2021 Pa. LEXIS 3819 No. <u>37 EAP 2020</u>  the Supreme court held; A petitioner has a rule-based right to the appointment of counsel for a first petition under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.§§ 9541-9546. Pa.R.Crim.P. 904 Pursuant to the procedural rule, not only does a PCRA petitioner have a right to counsel, but he is also entitled to the effective assistance of counsel. The guidence and representation of an attorney during collateral review ensures that meritorious legal issues are recognized and addressed, and that meritless claims are abandonded. While a PCRA petitioner enjoys this rule-based right to effective assistance of counsel, there is no formal mehcnism in the PCRA for a second round of collateral attack focusing upon the performance of PCRA counsel, much less is there a formal mechanism designed to specifically capture claims of trial counsel ineffectiveness

defaulted by initial-review PCRA counsel. Notwithstanding the absense of a formal mechanism to challenge the effectiveness of PCRA cousnel, we hold that a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting pro se, raise a claim of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal.

Your petitioner, David Barksdale, seeks review of these ground and subsequent claims under the well-established **Sixth** and Amendment law. *Strickland v. Washington*, 466 U.S. 668 (1984) (citing *Wiiliams v. Taylor*, 529 U.S. 362 (2000). Pensylvania applies a three-prong standard to [claims] of ineffectiveness, in which the Supreme Court has held:

> "In order to establish a claim of ineffectiveness under the PCRA, an Appellant 'must' show that:[1] the claim is of arguable merit;[2] that counsel had 'no' reasonable strategic basis designed for their action(s) or inaction(s); and [3] but for counsel's err of ommision(s), there existed a 'reasonable probability', that the outcome of the proceedings would have been different." Citing *Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999).

Therefore, prejudice under the <u>Strickland</u> standard is 'NOT' an outcome determinative test[9]. See <u>Strickland, supra</u>. Thus, the question is 'NOT' whether representation by effective assistance of counsel would have "more likely than not" changed the outcome. Id...instead, perejudice is established where the confidence in the outcome is so undermined [because] of counsel's deficiencies. Id. @ 694. Thus, the undermined confidence standard for prejudice "is NOT" a stringent one, it is less than the preponderance standard." *Hull v. Kyler*, 190 F.3d 88, 110 (3rd Circ. 1999) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (19860. Also see *Jackson v. Horn*, 395 F.3d 92, 105 (3rd Cir. 2005) (prejudice under <u>Strickland</u> is 'NOT' a stringent standard). Thus, petitioner need "ONLY" to show that a probability existed sufficient to undermine confidence in the outcome as <u>Strickland</u> does 'NOT' set a high bar with great respect to the prejudice and performance prongs. See also, *Thomas v. Varner*, 428 F.3d 491, 502 (3rd Cir. 2005).

Therefore petitioner had plead and proven material factual issues for review as the evidence in this case, or lack thereof, was significantly insufficient and resulted in the wrongful conviction of petitioner whom is actually and factually innocent, is entitled to a New Trial, or immediate relief on all the grounds and subsequent claims outlined herein this Writ of Habeas Corpus.

9.    <u>Williams</u>, 529 U.S. 406, outcome determinable test for ineffectiveness claims inconsistaent with the **Sixth** and **Fourteenth** Amendments; <u>Strickland</u>, supra.

<u>REASONS FOR GRANTING THE WRIT</u>

<u>CLAIM ONE</u>

BARKSDALE IS ENTITLED TO THE ISSUANCE OF A WRIT OF HABEAS
CORPUS, DISCHARGING HIM FROM HIS UNCONSTITUTIONAL CONVICTION
FOR FIRST DEGREE MURDER BECAUSE HE HAD A STATE AND FEDERALLLY
PROTECTED RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT PRE-
TRIAL, TRIAL, SENTENCING, AND DIRECT APPEAL PROCEEDNIGS WHERE AN
UNCONSTITUTIONAL BREAKDOWN OCCURED WHICH RENDERED THE
PROCEEDINGS FUNDAMENTALLY UNFAIR IN VIOLATION OF HIS DUE
PROCESS, AND EQUAL PROTECTION RIGHTS GOVERNED AND SECURED BY
THE <u>FIRST</u>, <u>FOURTH, FIFTH, SIXTH</u>, AND <u>FOURTEENTH</u> AMENDMENTS TO THE
UNITED STATES CONSTITUTION, AND <u>ARTICLE I, §§1, 6, 8, 9, 11, 13,</u> AND <u>14</u> OF
THE PENNSYLVANIA CONSTITUTION.

1.      In light of ***Comonwealth v. Bradley***, 2021 Lexis 3819 n. EAP 2020, PCRA counsel was
ineffective for failing to raise Prosecutorial misconduct, Abuse of Trial court discretion claims,
failed to properly preserve a layered ineffectiveness claim of prior counsel's failure to respond to
907 Notice of Intent to Dismiss PCRA. Prior PCRA counsel failed to specify and develope
petitioner's Amended PCRA petition raise in Supplemental PCRA, was ineffective for not
pressing the fact that the Appellant lawyer on Direct Appeal was constitutionally ineffective for
not claiming that the Trial lawyers were ineffective for failing to call Isaura Simpson-Perez as a
defense witness during Barksdale's trial. PCRA counsel was ineffective for failing to incorporate
Isaura Simpson-Perez statement to police, "she and David Barksdale witnessed Peggy Swann fall
down the basement stairs, ***they realized she was dead***, and moved her body to the washing
machine' in the 1925(b), appellate brief, nor the Allowance of Appeal to the Supreme Court.

        PCRA counsel misconstruded petitioner's PCRA claims by infusing several issues into
one claim, thereby avoiding to specify and develope the substance, and overall merit in each
claim. Counsel failed to incorporate Isaura Simpson-Perez's statement to police "she and David
Barksdale witnessed Peggy Swann fall down the basement stairs, ***they realized she was dead***,
and moved her body to the washing machine" in the 1925(b) statement, appellate brief in support,
nor the Allowance of Appeal to the Supreme Court. Counsel failed to raise a layered ineffective
assistance claim on all previous lawyers.  Counsel failed to act upon defendants claim of *'Newly
discovered'* evidence in the July 25, 2022 hearing in violation to **Pa.R.Prof.Cond. rule 1.3**

2.      The PCRA court judge denied a Motion to Recuse/Disqualify herself on May 5, 2020.
The rule that a judge whose impartiality has been challenged may not decide the merits of a
motion that he recuse himself and that if he neverthless does decide the motion, **{322 Pa.Super
484}** he exceeds his jurisdiction, is widely recognized.9 indeed, the rule may failry be
characterized as unquestioned. Two federal statues, 28 U.S.C. § 144, and § 455provide an
example of statutory recognition of the rule. Section 455 makes the Code of Judicial Conduct
applicable to the federal courts(just as our Supreme has made the Code applicable to
Pennsylvania courts).

The PCRA court judge refused to acknowlege irreconciliable difference in Grazier hearings held March 2, 2021, August 2, 2021, and on July 7, 2022. See ***Commonwealth v. Betts***, 240 A.3d 616 (Pa.Super 2020). The PCRA court failed to explain why counsel was not ineffective for meglecting to call Isaura Simpson-Perez as witness for the defense in the Memorandum Opinion, and 907 Notice of Intent to dismiss PCRA date October 1, 2019. In her Memorandum Opinion, the PCRA judge refused to acknowlege the Petitioner's Certificate of Witness list provided the name of witness, Tim Farner, who would have testified against Commonwealth witness Ian Munz, and Corey Williams. The PCRA court redacted her ruling that recordings of the defendant 'must' be played in their entierty, allowing the prosecution to only play snippits of the recording which prejudice the defendant; Trial Court N.T. p. 12-17

In Grazier hearings held August 2, 2021 the defendant reminds the Commonwealth of his obligation to ABA Model Rule 3.8 N.T.p.14 L's 22-25; N.T.p.15, L's 1-5  The prosecutor, Ryan Lysaght, acknowledges his obligation to comply with ABA Model rule 3.8  - (iiii) When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutors jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction; regarding Isaura Simpson-Perez confession to police "she and David Barksdale witnessed Peggy Swann fall down the basement stairs, ***they realized she was dead***, and moved her body to the washing machine.' N.T. p. L's 4-8; "We dont file new evidence when a case is on appeal." Petitioner's Allowance of Appeal to the Supreme court was denied September 20, 2022, thus he is no longer on appeal and has exhusted all remedies in the lower courts.

## CONCLUSION

In light of all the forementioned arguements, petitioner has been has denied Due Process, and Equal Protection rights governed and secured by the **FIRST, FOURTH, FIFTH, SIXTH**, and **FOURTEENTH** Amendments to the United States Constitution and **Article I, §§1, 6, 8, 9, 11, 13** and **14** of the Pennsylvania Constitution. Barksdals prays this court, after holding a hearing, and examine the evidence and applicable law, grant a Writ of habeas corpus vacating his conviction for First Degree Murder and discharge him from custody. He further prays for any other further relief as the Court deems just and equitable.

## II. RELIEF REQUESTED

**WHEREFORE**, request consist of, but is not limited to, the following on the aformentioned grounds and subsequent claims outlined herein:

1.    That this Court "Stay" these proceedings to preserve my filing date in abeyance to exhust all prior claims counsel failed to raise in the PCRA to exhust all state remidies.

2.    An immediate ORDER arresting judgment, **VACATE LWOP**, and the Release of confindment on the charges outlined herein for the defective and wrongful conviction of petitioner.

3.    Find that all previous counsel did, in fact, reder "global" ineffective assistance of counsel in this case.

4.    Find the PCRA Court in violation of Judicial Code of Conduct.

5.    Find the Prosecutor Office in violation of ABA Model Rules of Professional Conduct.

6.    GRANT petitioner the appoinment of Federal Public Defender counsel to meet and consult with petitioner to legitimately prepare for any further hearing or court proceedural rulings.

7.    Grant petitioner in forma pauperis status as he is an indigent pro se petitioner.

8.    Grant any other such relief as may be appropiate, as outlined supra, in all susequent claims thereunder, and as this Honorable Court deems just and proper in the intersts of justice.

55.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT

| | | |
|---|---|---|
| DAVID LESLIE BARKSDALE | : | CIVIL ACTION |
| | : | |
| PETITIONER, | : | No._____ |
| | : | |
| v. | : | |
| | : | |
| JOSEPH TERRA (Superintendant of | : | LOWER COURT |
| SCI Phoenix) | : | CP-22-CR-00003650-2015 |
| | : | |
| Respondant. | : | |

## CERTIFICATE OF SERVICE

I, David Barksdale, Petitioner *Pro Se*, hereby certify that on this day, are serving a true and correct  copy of the foregoing document(s) upon the person(s) and in the manner as indicated below, which servce satisfies the requirements of F.R.C.P. 5(b).

SERVICE BY FIRST CLASS MAIL
ADDRESSED AS FOLLOWS:
Ryan H. Lysaght, Esq.
Asssitant District Attorney
Dolphin County
101 Market Street
Harrisburg, PA 17101

Superintendent of SCI Phoenix
Joseph Terra
1200 Mokychic Drive
Collegeville, PA 19426

David Barksdale/MU-5159
1200 Mokychic Drive
Collegeville, PA 19426
(Mail By Court)

David Barksdale/MU-5159
P.O. Box 33028
St. Petersburg, FL. 33733
(Mail By Appellees)

Date: _December  5th_, 2022

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT

DAVID LESLIE BARKSDALE                  :          CIVIL ACTION
                                        :
          PETITIONER,                   :          No._____
                                        :
     v.                                 :
                                        :
JOSEPH TERRA (Superintendant of         :          LOWER COURT
SCI Phoenix)                            :          CP-22-CR-00003650-2015
                                        :
          Respondant.                   :

## VERIFICATION

I, David Barksdale, Petitioner *Pro Se*, have read the foregoing documents
and hereby verify that the matters alleged herein are ture, except to those
matters alleged upon information and belief, and, those matters I believe to be
true. I certify under penalty of perjury that the foregoing is true and correct
pursuant to 18.Pa.C.S A. § 4904 relating to unsworn falsification to authorities.

*David Barksdale*
David Barksdale/MU-5159                      David Barksdale/MU-5159
1200 Mokychic Drive                          P.O. Box 33028
Collegeville, PA 19426                        St. Petersburg, FL. 33733
(Mail By Court)                              (Mail By Appellees)

Date: December 5th, 2022

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT

DAVID LESLIE BARKSDALE    :  CIVIL ACTION
            :
     PETITIONER,   :  No._____
            :
  v.           :
            :
JOSEPH TERRA (Superintendant of :  LOWER COURT
SCI Phoenix)       :  CP-22-CR-00003650-2015
            :
     Respondant.  :

## CERTIFICATE OF COMPLIANCE

I, David Barksdale, Petitioner *Pro Se*, hereby certify that this filing complies with the Unified Judicial System of Pennsylvania; Case records of the trial Courts that require filing confidential information and documents differently than non-confidential information and documents.


David Barksdale/MU-5159
1200 Mokychic Drive
Collegeville, PA 19426
(Mail By Court)

David Barksdale/MU-5159
P.O. Box 33028
St. Petersburg, FL. 33733
(Mail By Appellees)


Date: December 5th, 2022